# EXHIBIT L



STATE OF CONNECTICUT
EXECUTIVE CHAMBERS

M. JODI RELL
GOVERNOR

### Testimony of M. Jodi Rell

#### Governor, State of Connecticut

*U.S. Senate Committee on Indian Affairs*

*Oversight Hearing on Tribal Recognition*

*May 11, 2005*

Chairman McCain, Vice Chairman Dorgan and distinguished members of the Committee. My name is Jodi Rell. I serve as Governor of the state of Connecticut. I thank you for scheduling this oversight hearing on tribal recognition and for inviting me here today. I also thank the members of Connecticut's Congressional delegation for their determined and unrelenting efforts, here in the halls of Congress and back home in Connecticut, to address the weaknesses and failings of the tribal recognition process. Their united leadership on this issue has been inspiring and is greatly appreciated by their constituents.

I appear before you today, giving my first congressional testimony as Governor of Connecticut, because this is such a critical issue to our state. Simply put, I strongly believe that a number of troubling, profound problems exist within the entire federal tribal recognition process and that legislative reform of this process is long overdue.

Let me unequivocally state that my concerns go directly to the issue of integrity and transparency of the recognition process itself, not to any particular tribe or their right to seek and receive recognition. To be sure, my state's history is inextricably intertwined with Native American history. In fact, the very word "Connecticut" is an Indian term which means "beside the long tidal river." We recognize and embrace our historical heritage and we have courteous, mutually respectful relationships with the Mohegan and Mashantucket Pequot Nations, both of which are located within the borders of our state.

STATE CAPITOL, HARTFORD, CONNECTICUT 06106
TEL: (860) 566-4840, FAX: (860) 524-7396
www.ct.gov/governor

Due to their own hard work and entrepreneurial spirit, these two tribal nations have thrived since receiving federal recognition several years ago. Their economic success has been nothing short of dynamic and has served as a catalyst for others, inside and outside of Connecticut, to seek recognition.

The process of federal recognition is admittedly lengthy and arduous - but for good reason. A successful petition for recognition, while serving as an official verification and validation of an historical group of people, will also dramatically and unalterably change the present day landscape of an entire community, region or state.

Connecticut is a relatively small state in geographical terms. Our state is as old as our nation itself and is densely populated. We have few vast expanses of open or undeveloped land, particularly in comparison to some of our Midwest and Western neighbors. Historical reservation lands no longer exist as such, and haven't for well more than two hundred years. They are now cities and towns, filled with family homes, churches, schools, shopping areas and the like.

It has been our experience in Connecticut that tribes simultaneously file land claims within the state as they pursue recognition with the federal government. Land claims place a cloud on the property titles of municipalities and their residents, resulting in many hardships and uncertainties. The land claims destabilize the housing market and compromise the ability of every homeowner or landowner within the claimed area to sell their properties free and clear in terms of title. In other words, someone living in a family home or on a family farm, which has been owned and passed down for several generations, may suddenly and startlingly be subject to an unforeseen land claim. Further, such a claim may not be based in fact, but rather on what a tribe contends its ancestral land to be.

This issue was very real to hundreds of thousands of Connecticut residents who lived under the constant threat of land claims by a group known as the Golden Hill Paugussetts, which claimed to be an Indian tribe. Approximately one quarter of the land area of our entire state was affected by this singular land claim, which languished for years as the Paugussetts sought multiple, and in the end unsuccessful, reviews of their recognition petition. For years, the land records of hundreds of thousands of homes, businesses, churches, town halls and schools in Connecticut were in danger of being clouded because of a specious recognition bid. I say specious because the state knew from the beginning - and the BIA finally figured out in the end -

that the Golden Hills Paugusetts did not in any way satisfy the necessary recognition criteria. We fought this recognition based on its shortcomings and inadequacies in the law, and we rightly prevailed. But the BIA has shown an increasing willingness to be "flexible" and "permissive" and to set aside the dictates of law and regulation in favor of granting recognition at all costs.

Let me say again, if a tribe can meet the requirements established by federal law to win federal recognition, it should be given all of the rights and privileges to which it is entitled. If a tribe cannot meet such criteria it should not be granted recognition – and yet it has, on two occasions, in Connecticut.

Given this, I cannot help but conclude that the process by which federal law is applied and recognition determination is made is broken. It is fatally flawed. It is inconsistent and often illogical. It is replete with conflicts of interest and disdain for adherence to the letter and spirit of law and regulation. It has resulted in a measurable loss of public confidence and an immeasurable lack of administrative integrity.

The two recent decisions impacting Connecticut, involving the Historic Eastern Pequot Tribe and the Schaghticoke Tribe, show the BIA's disregard for the law and a recognition system in need of wholesale restructuring.

In the case of the Eastern Pequot and Pawcatuck Eastern Pequot Petitions, the BIA miraculously achieved what neither petitioner could do or wanted to do on its own. That is, the BIA found that both tribes were a single "historical" tribal entity even though the tribes themselves could not agree on this point and did not seek such joint designation. Recognition evidently could not have been achieved individually by these tribes, so the BIA simply merged the petitions and the tribes themselves in order to grant recognition.

More recently, the decision by the BIA to recognize the Schaghticoke Tribe demonstrates what state officials and many citizens have long known. The BIA is awarding federal recognition to Indian tribes, regardless of evidence to the contrary. In December of 2002, the BIA issued a proposed finding that the Schaghticoke Tribe did not meet all seven criteria for recognition and the group's tenuous relationship with state of Connecticut did not add evidentiary weight to its claim. On January 29, 2004, little more than a year later, however, the BIA reversed itself and issued a final determination finding that the tribe's relationship with Connecticut did strengthen their petition. An investigation of this astonishing reversal revealed a memo written by BIA staff just two weeks before the final determination. In the memo BIA staff admits that the

Schaghticoke group did not meet the criterion for continuous political influence for two periods encompassing 64 years of its history. The memo also exposed that the BIA had full knowledge that the tribe had not met the seven mandatory criteria for recognition as established in regulations and precedent. The BIA, therefore, by its own written words, acknowledged that the Schaghticoke Tribe would not have been granted federal recognition if the BIA had followed federal law and existing precedent on recognition.

More recently, the BIA acknowledged that it used a flawed calculation method that mistakenly overstated the percentage of Schaghticoke-to-Schaghticoke marriages during the 19th Century. The error resulted in the recorded Schaghticoke intra-marriage rate falling to less than 20 percent, far lower than the required minimum of a 50 percent intra-marriage rate. Even with its own acknowledgement of this latest error, the BIA has not taken any visible action to reevaluate its flawed recognition of the tribe.

On another note further highlighting the failings of the BIA, a letter dated October 30, 2003, was uncovered that was sent from the Department of the Interior to the Hassanamisco Nipmuc petitioning group, a Massachusetts tribe with land claims in Connecticut. The letter was printed on DOI letterhead and identified as emanating from the "Office of the Secretary." It is addressed to a former BIA employee, who is, at present, the lead researcher for the Hassanamisco Nipmuc Band. The letter clearly outlines numerous ways in which the former BIA employee could manipulate the recognition criteria to ensure the success of his group's petition. The letter was unsigned and I am presently awaiting the results of an investigation by the Secretary of the Interior on the authenticity of the letter.

All three of the recognition petitions raise troubling concerns about the very integrity and administration of the BIA. Why has the BIA taken such an aggressive approach to federal recognition? Some say that its dual mission as Indian advocate and impartial decision-maker on recognition petitions are inconsistent and incompatible. Others believe that it has little oversight from Congress and that it would greatly benefit from an extension of ethics laws to its operations.

Regardless, as the recent unbalanced decisions by the BIA demonstrate, there must be more control over the recognition process. There needs to be a more transparent and open process. I recommend the following:

- <u>Codify the Recognition Criteria.</u> It is time for the Congress to step in and reform the system by statute. The seven mandatory criteria for recognition of Indian tribes must be codified in statute. Congress should make it clear that the seven mandatory criteria set forth in the regulations are, in fact, mandatory – not mere guidelines.

- <u>Impose a Moratorium.</u> Impose an immediate moratorium on all BIA acknowledgement decisions pending a comprehensive review of the BIA recognition process to ensure that the process is fair to *all* interested parties.

- <u>Eliminate the "Revolving Door" Exemption.</u> The exemption from the federal "revolving door" policy for the employees of BIA must be eliminated. This exemption allows former BIA officials to represent and lobby the BIA on behalf of groups seeking recognition immediately after they leave the agency.

- <u>Examine Impact of the Current Process.</u> Examine how the federal process is usurping the powers of state and local governments to control local economic development, plan for the long term, and provide public safety services.

- <u>Prohibit the Liening of Property by Tribes.</u> Prohibit the ability of tribes to place liens on property to which they lay claim. This power presently allows for tribes to hold communities and states hostage and undermines property values paralyzing home sales throughout the affected region.

- <u>Invalidate the Schaghticoke Decision.</u> I am aware Congresswoman Nancy Johnson has proposed legislation to repeal the recognition of the BIA's final determination recognizing the Schaghticoke tribe, in light of new evidence and grounds for appeal. I further support efforts by the Connecticut congressional delegation and Connecticut's Attorney General in seeking a ruling by the BIA to invalidate the Schaghticoke final decision and, if appropriate, remand the Schaghticoke application to the BIA for further consideration or forward the Schaghticoke application to the Secretary of the Department of the Interior for further review.

In conclusion, the BIA is a bureaucracy run amok. Connecticut, I am sure, is not alone in expressing frustration and anger about the current failed process. Legitimate tribes should have a legitimate opportunity to seek federal recognition. But the criteria and laws in granting

recognition must be clearly and stringently adhered to by the BIA.  Transparency must rule the process. The highest ethical standards for BIA employees must be put into place and met.  All parties involved in a recognition petition deserve to be treated fairly in accordance with BIA regulations and federal law.  Rules should not simply be changed in order to achieve a desired result.

I thank you for your time, and on behalf of the people of Connecticut, I ask that you consider the impact the current unrestrained recognition process is having on our state and others and that you adopt legislative and policy changes suggested to you today.  Thank you.

## TESTIMONY ON THE FEDERAL TRIBAL RECOGNITION PROCESS
### Senator Christopher J. Dodd
May 11, 2005

First, I would like to thank the Indian Affairs Committee -- particularly Chairman McCain and Vice Chairman Dorgan -- for holding this hearing this morning. No Committee has done more in the Senate, or in the whole Congress, to advance the cause of improving America's understanding of native peoples and native cultures. Chairman McCain and Vice Chairman Dorgan, along with their predecessors -- Senators Campbell and Inouye -- have worked tirelessly to enable America to better understand her native peoples and protect their sovereign states.

I would also like to acknowledge Governor Rell and my colleagues from the Connecticut Congressional delegation -- Senator Lieberman, Congresswoman Johnson, Congressman Shays, and Congressman Simmons. I would also like to acknowledge two other witnesses: Chief Richard Velky of the Schaghticoke Tribe and Mr. Ken Cooper of the Town of Kent, Connecticut.

At this time I ask Unanimous Consent that testimony given by the Attorney General of Connecticut, Richard Blumenthal, and by the First Selectman of Kent, Connecticut, Dolores R. Schiesel, be inserted into the Committee record.

As all of my colleagues know, Congress has the authority and a duty to respect, honor, and protect the rights of the sovereign Indian nations that reside within the borders of the United States. The federal government has a unique legal relationship with each tribal government that represents peoples whose ancestors were here even before people from the rest of world joined them in calling America "home."

For several years now, the recognition process administered by the BIA has come under scrutiny.  The General Accounting Office, in a study it released in November, 2001, concluded that –

"...because of weaknesses in the recognition process, the basis for BIA's tribal recognition decisions is not always clear and the length of time involved can be substantial."

These findings are reminiscent of the testimony offered by Kevin Gover, who until January 2001 was the Assistant Secretary for Indian Affairs. In May of 2000, Assistant Secretary Gover told this committee that –

"I am troubled by the money backing certain petitions and I do think it is time that Congress should consider an alternative to the [existing] process. [Otherwise], we're more likely to recognize someone that might not deserve it."

Mr. Gover further stated –

"(the) more contentious and nasty things become, the less we feel we are able to do it... I know it's unusual for an agency to give up a responsibility like this, (but) this one has outgrown us.... it needs more expertise and resources than we have available."

Furthermore, The Chairwoman of the Duwamish Tribe of Washington State testified that she and her people ``...have known and felt the effects of 20 years of administrative inaccuracies, delays and the blasé approach in...handling and...processing the Duwamish petitions."

Taken together, these statements speak to a startling admission. I would suggest that any time an Assistant Secretary says in effect that his or her agency is incapable of grappling with one of its fundamental responsibilities, that person is issuing a cry for help that should not and cannot be ignored.

I am not here to criticize the civil servants at the BIA. They are doing their best under extremely difficult circumstances and with little financial assistance. In fact, I recognize that the BIA has begun to address some of the concerns outlined by the GAO report. Most notably, the Bureau has taken steps to improve its records management system on recognition decisions, technical assistance materials, and Interior Board of Indian Appeals decisions. These steps will hopefully bring greater accountability and transparency to the work undertaken by the BIA.

3

Nevertheless, much more work needs to be done if we are going to achieve our goal of making the tribal recognition process as open, fair and transparent as possible. Administrative irregularities, accusations of influence peddling, and a process that is generally perceived as exceedingly arcane and opaque have given rise to profound doubts about the viability of the decisions being rendered by the Bureau. This is no way for the federal government to determine the legal status of tribal groups and to set the conditions for how those groups will interact with state governments, municipalities, and federal agencies.

As Senator Inouye said two-and-a-half years ago on the Floor of the Senate, the process for conferring federal recognition on our nation's Indian tribes is a "...scandal...[that] should be changed." Those tribes deserve better. And so do others who look to their government to act fairly and expeditiously. I believe that we have an obligation to restore public confidence in the recognition process.

Toward this end, Senator Lieberman and I have reintroduced two bills designed to ensure that the recognition process will yield decisions that are beyond reproach.

The Tribal Recognition and Indian Bureau Enhancement, or TRIBE, Act would improve the recognition process in several ways. First, it would require that a petitioner meets each of the

4

seven mandatory criteria for Federal recognition spelled out in the current Code of Federal Regulations. It is by now well known that several decisions of the BIA applied all seven criteria to some tribes, but not to others. This is patently unfair to those tribes subjected to a higher level of scrutiny by the BIA than other tribes. It runs contrary to our country's sense of fair play. Second, the TRIBE Act would provide for improved notice of a petition to key parties who may have an interest in a petition, including the governor and attorney general of the State where a tribe seeks recognition, other tribes, and elected leaders of municipalities that are adjacent to the land of a tribe seeking recognition. Third, it would require that a decision on a petition be published in the Federal Register, and include a detailed explanation of the findings of fact and of law with respect to each of the seven mandatory criteria for recognition. Fourth, the TRIBE Act would authorize $10 million per year to better enable the Bureau of Indian Affairs to consider petitions in a thorough, fair, and timely manner.

I want to emphasize what this legislation would not do. It would not in any way alter the sovereign status of tribes whose petitions for Federal recognition have already been granted. It also would not restrict in any way the existing prerogatives and privileges of such tribes. Tribes would retain their right to self-determination consistent with their sovereign status. Finally, and

perhaps most importantly, the TRIBE Act would not dictate outcomes nor would it tie the hands of the BIA. It would simply create a uniform recognition process that is equal and fair to all.

Our second bill would provide grants to allow poor tribes and municipalities an opportunity to participate fully in important decision-making processes pertaining to recognition. Consequently, these grants would enable these communities to provide to the BIA more relevant information and resources from which to make a fair and fully-informed decision on tribal recognition. When the Federal Government, through the BIA, makes decisions that will have an enormous impact on a variety of communities--both tribal and non-tribal--it is only right that the Government should provide a meaningful opportunity for those communities to be heard.

I believe that every tribe that is entitled to federal recognition ought to be recognized and ought to be recognized in an appropriately speedy process. At the same time, we must make sure that the BIA's decisions are accurate and fair. Every recognition decision carries with it a legal significance that should endure forever. Each recognition decision made by the BIA is a foundation upon which relationships between tribes and States, tribes and municipalities, Indians and non-Indians will be built for generations to come. We need to make sure that the foundation

upon which these lasting decisions are built is sound and will withstand the test of time. We cannot afford to build relationships between sovereigns on the shifting sands of a broken bureaucratic procedure.

## STATEMENT BY SENATOR LIEBERMAN ON TRIBAL RECOGNITION

### Committee on Indian Affairs

### Oversight Hearing on the Tribal Recognition Process

**May 11, 2005**

Mr. Chairman, thank you for holding this hearing today on the process of tribal recognition. My home state of Connecticut is not alone in finding this a critical issue, where the stakes are high for local communities, for people seeking recognition and for those tribes that have gained recognition. All have a vital stake in ensuring the legitimacy and credibility of the process.

To most others, tribal recognition means casino gaming, and, as such, is among the top issues of concern cited by the public. In fact, many see acutely the linkages between this issue and other priority concerns, such as suburban sprawl and traffic congestion and the overall quality of life in their local communities.

That is why it is urgent for the federal government to undertake a complete overhaul of the badly broken federal tribal recognition process. If we are going to treat groups seeking recognition fairly, while making decisions that so clearly affect the economics and quality of life in so many local communities across the country, we must ensure the Bureau of Indian Affairs renders every single one of its decisions according to clearly defined recognition criteria that everybody sees and understands.

Now, let me state clearly at the outset of this hearing as I have done in the past, that I do not oppose the recognition of historic Native American tribes. That is one of the reasons that I find so troubling recent decisions by the Bureau of Indian Affairs, decisions that so clearly demonstrate that the tribal recognition process is dysfunctional. Recent

Native American tribal recognition decisions in Connecticut, for example, on when and how to satisfy recognition criteria have been murky at best. Lacking clear transparency needed to foster and sustain strong public confidence, BIA decision making has lost an enormous amount of public credibility. Neither Native American groups and tribes, nor the general public can afford or accept a process that smacks of outright manipulation and abuse of government authority.

The public's widespread belief in the nexus between tribal recognition and casino-openings is well-founded. There are, at present, 411 Native American casinos in the United States, operated by 223 tribes in Connecticut and 27 other states. More than half of the 341 federally recognized Native American tribes operate casinos in the United States.

Connecticut has two casinos operated by the Mashantucket Pequot Tribal Nation and Mohegan Tribe. To be sure, both tribes have created approximately 20,000 jobs, and contribute more than $400 million to Connecticut's budget, based upon each tribe's 25 percent share of slot revenues under tribal-state compacts. Still, these benefits come with community impacts and costs that continue to alarm Connecticut's citizens, costs that give them a real stake in the process.

In November 2001, the General Accounting Office evaluated the Bureau of Indian Affairs tribal recognition process, and its findings delineate a process that is subject to manipulation and abuse. In its report, the GAO found that "the basis for BIA's tribal recognition decisions is not always clear". Furthermore, the report went on to state:

> "[...] while there are set criteria that petitioners must meet to be granted recognition, there is no clear guidance that explains how to interpret key aspects of the criteria. For example, it is not always clear what level of

2

evidence is sufficient to demonstrate a tribe's continuous existence over a period of time - one of the key aspects of the criteria.  As a result, there is less regulatory certainty about the basis for recognition decisions."

The GAO's critique was echoed, in part, by the Interior Department's Inspector General and even the past Assistant Secretary for Indian Affairs.

Where standards are unclear and interpretive rules are uncertain, arbitrariness and abuse are nearly inevitable.

Two recent BIA decisions, one recognizing the Eastern Pequot and the other the Schaghticoke, make the problem perfectly clear.   The Eastern Pequot decision actually involved recognition petitions from two different groups, each of which insisted that they comprised two totally separate tribes.  Completely on its own motion, the BIA nonetheless created a new tribe by merging the two petitioners into one tribe.  The BIA affirmatively reached out and created a new tribe when no one was requesting it, using legal analysis for this unprecedented decision that defies logic. In particular, the BIA relied on Connecticut's historic recognition of the tribe to fill gaps for "specific periods [of time] where the other evidence in the record concerning community or political influence would be insufficient by itself."  This decision remains on appeal.

The Schaghticoke decision concerns the BIA's reversal of a preliminary decision to deny federal tribal recognition by again using the State of Connecticut's recognition to "bridge the gap" of obviously lacking evidence regarding continuous political activity.  In the aftermath of this decision, my colleague, Senator Dodd, led a request for the Interior Department's Inspector General to investigate the Schaghticoke decision.  Although the IG's August 2004 report found no actual malfeasance or wrongdoing, the BIA subsequently

3

revealed that it made a critical error in calculating the marriage rate between Schaghticoke tribal members during the 19th century.  New marriage figures calculated by the BIA dropped the Schaghticoke intra-tribal marriage rate below the threshold that automatically satisfies one of the seven federal recognition criteria.  The BIA refused all Connecticut lawmaker requests for immediate reversal of its decision, and this case also remains on appeal.

If the Eastern Pequot and Schaghticoke recognition decisions are upheld, local residents will have to bear the economic and social costs associated with the prospect of two new casinos that will forever change their quality of life. Because of the enormous implications, it's not too much to ask that the BIA process be free of any perceived decision-making bias before issuing tribal recognition decisions.

Senator Dodd and I tried to fix the federal tribal recognition process problems cited in the GAO's report by introducing legislation that would have created a more fair and open tribal recognition process.  We remain unwavering in our commitment to reform the process so that these critical decisions are based on fair, consistent, and accurate procedures, and have reintroduced The Tribal Recognition and Indian Bureau Enhancement (TRIBE) Act to enact these reforms:

- Codify existing criteria used to make recognition decisions, and require that all     Native American tribes met all outlined criteria before being granted federal recognition  as a sovereign nation;

- Require BIA to provide notice of pending petitions to a wide range of interested groups, including the general public, other tribes, counties, towns, and states where the petitioning group is located;

4

- Allow BIA to hold formal hearings where interested parties can present evidence, examine witnesses, and rebut evidence in the record; and

- Increase BIA budget from $900,000 to $10 million annually to drastically reduce the    pending petition backlog. A related bill would provide financial assistance to towns and tribal groups who cannot afford to participate in BIA proceedings.

Our legislation is a balanced effort to fix the acknowledged problems in the BIA's tribal recognition process. BIA must provide adequate procedures to ensure its legitimacy, and have the increased resources and staff needed to follow these procedures fully. The TRIBE Act will benefit both Native American tribes and the communities most directly affected by the growth of casino gambling. All stakeholders must be provided the financial tools to participate meaningfully in the recognition process.

I want to again stress that the TRIBE Act does nothing to affect already recognized federal tribes nor hinder their economic development plans. We want these procedural reforms to fix the shortcomings identified in the GAO report, which are undermining the legitimacy of the entire process.

Senator Dodd and my legislation dictates no outcomes. It simply makes necessary reforms to ensure a fair process that is more accessible and more transparent to all affected parties.

In closing, I urge my colleagues on both sides of the aisle to support this legislation. The tribal recognition process is a critical matter not only for Connecticut, but for many other states. Mr. Chairman, your committee has the opportunity to fix a broken process and I thank you for this opportunity to urge you to do so.

Testimony of The Honorable Nancy L. Johnson

before the

U.S. Senate Committee on Indian Affairs

May 11, 2005

Mr. Chairman and members of the Committee, thank you for inviting me to testify today on the important subject of the Bureau of Indian Affairs' federal recognition process. This issue is of significant concern to my constituents in Connecticut's Fifth District.

Problems within the BIA process are well-known and have been documented by well-respected, independent agencies. In 2001, the U.S. General Accounting Office reported that the recognition process is characterized by inconsistency, unfairness, and delay. A subsequent report by the Interior Department Inspector General about the recognition process cites troubling irregularities, the use of political influence in what should be an objective process, and the questionable practice of recently-departed BIA officials lobbying for petitioning tribal groups.

Mr. Chairman, the BIA's tribal recognition process has failed the people of Connecticut, particularly its erroneous and unlawful decision to acknowledge the Schaghticoke Tribal Nation of Kent.  Simply put, it was made by ignoring evidence, manipulating federal regulations and overturning precedent.

As the Committee knows, the Bureau of Indian Affairs is permitted to recognize a tribe only if it satisfies each of the "seven mandatory criteria" laid out in federal regulations, including the key criteria that the tribe demonstrates it has exercised political authority over a community throughout its history.

-1-

The reasons for these strict, mandatory criteria are manifest. The establishment of a federally recognized tribe has significant and irreversible effects. Federally recognized tribes are:

- Exempted from a broad range of state laws and regulations, including state and local taxation.

- Allowed to build Las Vegas-style casinos, placing unbearable burdens on municipalities, on local tax bases and taxpayers, and on an aging infrastructure that could not tolerate the volume of traffic such a facility would create.

- Allowed to pursue land claims in court, which can threaten local property rights, cloud title in widespread areas, and prevent property sales.

Mr. Chairman, the evidence convincingly shows that the Schaghticoke petition did not satisfy each of the seven mandatory criteria, and the BIA manipulated both the evidence and established acknowledgment standards to get the petition over the goal line. More particularly:

- The BIA ignored agency admissions that "insufficient direct evidence" or "little or no direct evidence" exists to satisfy the key political authority criterion for over a century.

- The BIA overturned longstanding agency precedent when it erroneously interpreted the relationship between the State of Connecticut and the Schaghticoke people;

- The BIA used unprecedented and inaccurate accounting methods to calculate tribal marriage rates, without which the STN would not have satisfied the criteria for political authority for a 74 year period.

We know this because the BIA told us so. In a now-infamous "briefing paper" prepared

-2-

by BIA staff two weeks before it granted recognition, a strategy was outlined for BIA officials to overturn existing agency precedent and ignore federal regulations in order to find in the Schaghticoke's favor. In the briefing paper, BIA staff informed their superiors that key evidence of political authority – evidence necessary to grant recognition – was "absent or insufficient for two substantial historical periods." Furthermore, the briefing paper freely admits that declining to acknowledge the Schaghticoke "maintains the current interpretations of the regulations and established precedents how continuous tribal existence is demonstrated." Faced with the evidence and the law that demanded a negative result, the BIA ignored the evidence and reinterpreted the law. This is not how the American people expect their government to operate.

Last December, the Interior Department's Office of the Solicitor advised the Interior Department that the BIA used an unprecedented methodology and made material mathematical errors is calculating tribal marriage rates. Without these mistakes, the Schaghticoke petition would not have satisfied key criteria and would not have been recognized. Even the Office of the Solicitor advises the Interior Board of Indian Appeals, where the case is now being heard, that the BIA's decision "should not be affirmed on these grounds absent explanation or new evidence."

The BIA's decision in the Schaghticoke case is currently being appealed to the Interior Board of Indian Appeals. Our experience to date gives me little confidence that the IBIA will set correct the BIA's decision. Last year I wrote to the IBIA on behalf of my constituents seeking information on what the IBIA has done and when it expects to render a decision. The Board refused to reply with this information.

Given the grave consequences of the BIA's unlawful actions, I recently introduced *The*

-3-

*Schaghticoke Acknowledgment Repeal Act of 2005* in the U.S. House of Representatives. This bill overturns the BIA's erroneous and unlawful decision to grant federal recognition to the Schaghticoke. This legislation recognizes the fact Congress cannot allow the result of an unlawful federal recognition process to stand. I respectfully urge the Committee to review it and consider it as you move forward with your work.

This Committee is rightly examining the recognition process writ large. I wholeheartedly support this effort, and I support legislation introduced by my colleagues to make the process fair, objective and accountable to the public.

I also believe the recognition process must take into account the very different histories of descendants of Native Americans in the eastern United States and those from out west. Connecticut State Archaeologist Nicholas Bellantoni argued before a public forum in March that the "historical context" varies between tribal groups around the country. While contact between European settlers and Native Americans in the eastern states has been continuous since the landing at Plymouth rock, Professor Bellantoni noted that in the western states contact may have only come in the mid-19th century. For Connecticut, continuous contact between settlers and Native Americans began 175 years before there was even a United States. I believe the recognition process does not recognize the divergent history between east and west, instead imposing a one-size-fits-all standard on tribal groups.

But I would remind the Committee that prospective reforms to the recognition process will not fix the BIA's erroneous and unlawful decision in the Schaghticoke case, and it may not prevent the financial interests backing this petition from moving closer to their goal: a Las Vegas-style casino in an area of Connecticut that does not want one nor can support one.

-4-

Mr. Chairman, Members of the Committee, the BIA has failed the people of Connecticut and the United States. It respectfully urge this Committee not only to look toward reforming the BIA recognition process, but also correcting its past failures, as in the Schaghticoke case. The reasons for moving forward with strong reform are plentiful, the reasons for accepting the status quo are non-existent. I believe that the public's trust in good and responsible government requires action by this Committee and this Congress.

Thank you.

**Testimony of Congressman Christopher Shays Before the Senate
Committee on Indian Affairs**

May 11, 2004

Mr. Chairman and members of the Committee, thank you for allowing me to come before you and testify on the Bureau of Indian Affairs recognition process. The subject is of great importance to the Fourth District and our state because several tribes in Connecticut are seeking to open Class III gaming facilities on off-reservation lands.

The Schaghticoke Tribal Nation of Kent is seeking to build a casino in Danbury, Waterbury or Bridgeport. The Golden Hill Paugussett tribe of Colchester, although ultimately rejected by the BIA, has been seeking to build a casino in Bridgeport and is still pressing land claims. Both the Historic Eastern Pequot tribe of North Stonington and the two Nipmuc groups in Massachusetts are seeking to build casinos in Eastern Connecticut.

Given the extraordinary consequences of Federal recognition in the era of Indian gaming, it is particularly important for the process to be fair, objective and transparent. The granting of federal recognition to state tribes is analogous to giving them a license to print money.

I believe we need full and accurate knowledge of the extent to which financial interests influence the federal recognition process. Recent hearings of the House Government Reform Committee, of which I am the Vice-Chairman, have revealed the substantial casino interests financing acknowledgment petitions in Connecticut. I believe big money gaming interests have corrupted the federal recognition process. The case of the Schaghticoke Tribal Nation is a case in point.

On January 29, 2004, the Bureau of Indian Affairs announced its decision to recognize the Schaghticokes as a federal tribe, even though it seemed clear they did not meet the Bureau's seven criteria for proving continuity from pre-colonial times.

On March 12, 2004, the *Hartford Courant* made public a memo circulated within the Department of Interior that indicated that the Schaghticokes were granted recognition without having met the criteria the BIA has established to evaluate petitions for tribal recognition. The memo demonstrated the

1

agency knew the tribe lacked political continuity, one of the seven criteria that must be met to gain recognition, for a period of 64 years in the 19th and 20th centuries. The memo also brought into question several people whose names were on the petition, but who were never members of the tribe. Even more disturbing, the memo provided directions for recognizing the tribe in spite of the fact that it did not meet some of the established criteria.

The private investors who stand to make an absolute fortune from recognition decisions, and the casino developers, who encourage groups to seek recognition, even when those groups might not have united to do so because they do not meet the recognition criteria, need to be rooted out from the recognition process. The influence exerted by the huge, undisclosed sums being poured into the process has distorted the tribal recognition process to the point where it bears no resemblance to its governing statues and regulations.

It seems to me wealthy investors should not be able to manipulate the federal recognition process by investing huge sums of undisclosed money in order to bolster petitioners' claims. Furthermore, legitimate tribal interests are finding themselves in a process where they cannot hope to gain recognition without being able to spend lavish sums of money on lobbying -- making a mockery of the original intent of the federal recognition process. Simultaneously, a shadow has unfairly been cast over all of the tribes that have met the criteria and achieved due recognition.

Our nation has a responsibility to uphold certain unbreakable obligations to the continent's native peoples, but I believe big money gaming interests, which have literally started assembling tribes with the hopes that they can eventually reap huge profits from Indian casinos, have corrupted the process.

The bottom line is, until the special interests of wealthy casino developers and investors are held accountable, tribes such as the Schaghticokes will continue to get federal recognition when it's clear they do not meet the criteria.

We need legislation like Congressman Simmons' bill, H.R. 1354, of which I am a cosponsor. His bill would codify the seven criteria used by the BIA to evaluate petitions for federal recognition and close the revolving door at the BIA to prevent those who have advocated on behalf of tribal petitioners

2

from taking positions at the BIA that determine the validity of those petitions.

Indian gaming is a $23 billion industry and its expansion hinges upon the federal recognition process. It is absolutely essential this process is conducted in a fair, objective and transparent manner.

Thank you for considering my testimony.



# TESTIMONY
## SENATE INDIAN AFFAIRS COMMITTEE
## HON. ROB SIMMONS (CT-2)
## May 11, 2005

Mr. Chairman and members of the Committee,

Thank you for holding this hearing, and for allowing Connecticut officials to testify on behalf of our home state. I'm glad to join my Connecticut colleagues from both houses of Congress and from both sides of the aisle. As with all issues that so deeply affect our home state, this is an issue where we, as a delegation, try to speak with one voice without regard to party affiliation.

I also want to thank our wonderful governor, Jodi Rell, for taking the time from her busy schedule to come to Washington to testify at this hearing. She has shown great interest and commitment to this issue since taking office. I know I speak with the entire delegation when I say thank you, Governor, for your leadership on this and so many other important issues facing our great state.

Mr. Chairman, there are few other matters as important to our state and my congressional district as that of a deeply flawed tribal recognition process.

Indeed, no other state in America has felt the impact of the Bureau of Indian Affairs' (BIA) broken recognition process than Connecticut. We are host to two of the world's largest casinos: Foxwoods Resort Casino run by the Mashantucket Pequot Tribe and Mohegan Sun run by the Mohegan Tribe. And with more groups seeking recognition over the past three years, we face the potential of at least two more casinos in the immediate future.

To be fair, Connecticut has seen both the benefits and the adverse effects of tribal recognition. One benefit is that Indian gaming has produced jobs at a time when defense contracting and manufacturing have been on the decline. Foxwoods Resort and Mohegan Sun purchase goods, provide services, and contribute upwards of $400 million a year into the state budget in slots revenue. Tribal members have also been personally generous with their wealth, supporting numerous community projects and charities.

But there is also a considerable negative impact. In Connecticut, recognition has meant the right to operate a casino that places pressure on small local municipalities who have no right to tax, zone or plan for these facilities. Small rural roads are overburdened with traffic, understaffed local police departments are routinely working overtime, and volunteer fire and ambulance services are overwhelmed with emergency calls. The small towns that host and neighbor these casinos are simply overwhelmed by this strain. My friend Nick Mullane, the

First Selectman of North Stonington, has testified in great depth numerous times before Congress about the unique burden towns such as his must bear.

In year's prior, many in Connecticut questioned the presence of tribal casinos because they wondered whether the federal process was fair. The people of Connecticut no longer wonder. They know the federal system is broken.

BIA's recent actions involving groups in Connecticut seeking status as Indian tribes under federal law demonstrate that the acknowledgement process is not objective and not based in the criteria set forth. This, of course, is not the fault of the petitioning groups, some of whom I have considered friends and neighbors for many years. It is the fault of the federal government. Congress must exercise our jurisdiction over these issues and act promptly before a serious problem grows worse.

Over the last three years, BIA has issued final determinations that would grant federal tribal status to two groups in Connecticut. The first of these was the "Historic Eastern Pequot" tribe, located in the town of North Stonington in my congressional district. The second was the Schaghticoke Tribal Nation, in the town of Kent in the congressional district of Ms. Johnson.

In this same time period, the BIA denied recognition to the Golden Hill Paugussett group, located in Colchester and Bridgeport, and the to the two Nipmuc groups, located in Massachusetts but targeting land in northeastern Connecticut – in my congressional district. Both the Golden Hills and the Nipmucs are now pursuing appeals to overturn the BIA's decision.

With such significant decisions pending before a federal body, it is our duty in Congress to ensure that a fair and objective procedure is used to make these decisions. This is an important point, Mr. Chairman. Under the Indian Commerce clause to the Constitution, Congress has plenary authority over Indian affairs. Indeed, this body has in the past recognized tribes. Congress has *never* delegated the authority to acknowledge tribes. Court decisions may have established that the executive branch has the responsibility to oversee Indian affairs, but no judicial decision has ever explicitly delegated to the executive branch the authority to decide the fundamental question of what groups will be granted federal recognition.

Moreover, Congress has never taken the constitutionally necessary step of defining and placing in statute the seven standards under which BIA is to rule on tribal acknowledgment petitions. Absent this statutory guidance from Congress, BIA has time and again flouted their own regulations. The seven criteria are viewed as mere suggestions or guidelines, easily ignored or bypassed when necessary to reach a desired result. Even the Inspector General of the Department of Interior, Earl Devaney, admitted as much when in issuing a report on the Schaghticoke decision he described the process as being "permissive and inherently flexible."

Indeed, there is no better example of this disregard for the regulations in place than in the case of the Schaghticoke decision. In an internal memorandum prepared by staff in the BIA's Office of Federal Acknowledgement for one of the top officials in charge of recognition, there was a road map or blueprint laid out as to how BIA could justifiably find in favor of the

Schaghticokes despite their own admittal that "based on the regulations and existing precedent" they did not meet the standard for recognition. The disclosure of this memo laid bare what we in Connecticut have known to be the case for some time, Mr. Chairman – officials at the BIA are more advocates and consultants to groups seeking recognition than they are impartial arbiters of tribal history and continuity.

We all agree that legitimate groups need to be granted the federal status they deserve and accorded their sovereign rights, but the determination to acknowledge such tribes cannot and should not be made unless these groups clearly meet each of the seven criteria. To make certain these standards are met, I have introduced legislation that would codify each of these seven criteria, ensuring that "federal acknowledgement or recognition shall not be granted to an Indian tribe unless the Indian tribe has met all of the criteria listed." This law will provide an equitable process to groups that clearly meet all seven tests, while preventing claims from groups that fall short of one of these standards. No longer will the BIA be able to pick and choose or simply work around the criteria to find in favor of a petitioner, as they did in the case of the Schaghticokes.

And the problem is no longer limited to just our state. Indian recognition and the possibility it brings to open a casino has become a tremendously lucrative proposition to gambling interests and some developers. In 1999, federally recognized tribes reported about $10 billion in gaming revenue, which was more than Nevada casinos collected that year. By 2001, Indian gaming revenues rose to $12.7 billion. Last year it was $18.5 billion from tribes across 28 states – more than half the union. Predictably, wealthy individuals and corporations have begun to lobby on behalf of groups seeking federal recognition. More disturbing, individuals have gone directly from BIA into the private sector to lobby their ex-colleagues on behalf of these wealthy gambling interests. This is because BIA is currently exempt from the federal law that makes other federal officials – including members of Congress – wait at least one year before lobbying the federal government. If *any* federal agency needs this law it is the BIA. These officials need a "cooling-off period" during which they can put distance between their public service and private gain. The legislation I introduced on behalf of the Connecticut House delegation to put the seven criteria in statute would also end this troubling exemption and stop the rapidly spinning revolving door.

Mr. Chairman, as we will hear today from some of our distinguished guests, the revolving door issue is representative of a greater issue -- the ability of petitioners that are backed by powerful gambling interests to get to the front of the line. In March of last year, the *New York Times* detailed in a front-page story the ties between these powerful money interests and petioner groups. Included in this article was a reference to the business relationship between the most recent head of the BIA, David Anderson, and the primary backer of the aforementioned Nipmuc groups, Lyle Berman. Mr. Anderson and Mr. Berman were founding partners of what is now Mr. Berman's casino development company, Lakes Entertainment. Lakes Entertainment has provided nearly $4 million to the Nipmucs in their effort to obtain federal recognition.

Faced with questions from me and other members of our delegation, Mr. Anderson took the step of recusing himself from all federal recognition decisions and eventually resigned just one year into his tenure at the agency. Three months after his resignation, the president has yet to offer a nominee to take the helm at this troubled agency. Mr. Chairman, when the top official at the body tasked with making Indian recognition decisions must remove himself

from these decisions because of *his own* ties to gambling interests I think the problem becomes self-evident.

Before I close my remarks let me share one more story that I think illustrates the problem that brings us here today. As I mentioned earlier, there are two groups -- both known as the Nipmucs -- based in Massachusetts but seeking to build a casino in Connecticut. Although both of the competing groups saw their petitions turned down by the BIA last spring, each has appealed. It was revealed last fall that there was a letter on Department of Interior letterhead offering strategic advice to one band of the two groups as to how best to pursue federal recognition. The letter was unsigned and crafted in a very unprofessional manner and officials at the Interior Department were quick to deem it a forgery. I have no reason to believe it was not, but this episode along with that of the Schaghticoke decision memo I discussed earlier raises a larger point. When we see such flagrant acts of one-sided advocacy in favor of tribes, as we did in the Schaghticoke case, why wouldn't we believe that officials at this agency would pen such a letter? And more troubling, how are we to know what other documents or evidence in the system is fraudulent?

And therein lies the problem. When you combine tribes who are, in many cases, genuinely seeking to improve the lives of their members, gaming interests eager to exploit a growing market, and pliant BIA officials more interested in recognizing as many groups as possible than in objectively applying the rules provided, you are left with a corrupt system that tragically casts doubt on all recognition decisions.

In conclusion, Mr. Chairman, we want more control over the process. We want more transparency and definition to the process. We want relief provided to our localities for what can be a very expensive battle on a very uneven playing field. And we want to get the money out of the process to ensure that recognition decisions are obtained by who can meet a defined and consistently applied set of standards, not those who can plow the most money into an application.

The victims of the situation include all parties to the acknowledgment process – petitioning groups, states, local communities, and the public. By giving the recognition standards the power of law and closing the revolving door, we can begin to do so. This is the only way to ensure fair, objective and credible decisions.

Thank you for considering my testimony and allowing me to join this important hearing today.

# EXHIBIT M

**RICHARD BLUMENTHAL**
ATTORNEY GENERAL



55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

Office of The Attorney General
# State of Connecticut

### TESTIMONY OF
### ATTORNEY GENERAL RICHARD BLUMENTHAL
### BEFORE THE SENATE COMMITTEE ON INDIAN AFFAIRS
### MAY 11, 2005

I appreciate the opportunity to submit testimony.

I urge Senators to seize this unique moment -- and match rhetoric with real reform totally overhauling a tribal recognition system that is lawless, leaderless, and out of control.

The present process is broken beyond fixing. It should be scrapped. Reform is long overdue. It must be systemic, not superficial. It must establish an independent system insulated against gambling money that now so perniciously drives the process.

Admiring the chairman as no-nonsense, straightforward and frank, I will try to be the same. My proposed reforms are as simple and specific as they are essential:

- Abolish the BIA tribal recognition authority;
- Establish an autonomous agency -- a Federal Tribal Recognition Commission (FTRC) -- with authority over recognition and trust land decisions;
- Enact recognition criteria into statute;
- Provide sufficient resources to fund the FTRC;
- Set strict, strong disclosure and ethics rules for the FTRC;
- Assist affected towns and cities in participating in the process;
- Impose a 6-month moratorium on all recognition decisions.

Whatever disagreements there may be about solutions, there seems to be a clear consensus on the central problem: the present tribal recognition process is irretrievably, irrefutably broken -- dysfunctional, a shambles. Scrapping and replacing it is an urgent necessity. Now is a historic moment -- indeed, the moment -- for action not just talk.

What makes this moment so uniquely promising is new leadership on this Committee, new-found awareness and alarm about the system's insidious flaws, and new evidence of the corrosive consequences. We can rid the recognition process of corrupt influences and regain public confidence and trust.

For twelve years, I have been fighting for fairness and accountability in the tribal recognition process. For many of those years, mine was seemingly a singular voice. Those times were lonesome -- made less so only by local officials and citizens from North Stonington,

Preston, Ledyard and other towns with the conviction and courage to stand up and speak out. I have fought to receive critical public documents from the Bureau of Indian Affairs (BIA) -- documents we were clearly entitled to receive under federal law. Protecting our state's interests, I have appealed arbitrary administrative decisions and challenged BIA findings lacking any basis in fact or law. I have also testified before congressional committees -- including this one -- urging oversight investigations and reform.

The current process demeans and discredits groups that legitimately deserve federal tribal recognition, delays expeditious review of petitions and hinders participation of affected parties in the process. Money, politics, and personal gain have transformed tribal recognition decisions into crude contests of influence instead of objective assessments of evidence. The BIA now is often arbitrary and capricious, ignoring or bending its own rules to reach illegal recognition decisions bought by powerful interests, and continuing this practice to enhance casino interests at the expense of local communities and citizens.

A recent example of this lawless conduct is the BIA's recent publication of a "checklist" for gaming related trust land acquisitions. The BIA has, once again, unilaterally imposed rules that have profound adverse impacts on local communities without permitting public scrutiny and input.

The effect of these rules is to make expansion of reservation land for gaming easier by eliminating the need for gubernatorial agreement and community input for annexation of land with gaming related purposes -- in violation of the Indian Gaming Regulatory Act (IGRA). I am attaching a copy of the checklist to this testimony.

The checklist purports to be an "internal agency guideline" on gaming related trust acquisitions -- one of the most controversial and intrusive aspects of federal Indian law. The BIA's decisions to take land into trust for Indians -- essentially turning private land into sovereign tribal land--- have significant impacts on States, local communities and the public, particularly when the land is used for gaming or gaming related purposes. Far from being simple internal guidelines, this co-called "checklist" in reality establishes new standards for making these critical trust decisions, standards that will result in less public scrutiny and severely limit the rights of local communities that will be directly affected.

These new rules will have a significant impact in Connecticut. Two Connecticut groups whose positive tribal recognition decisions are currently being appealed -- the Historic Eastern Pequots and the Schaghticokes -- have both already indicated that they will seek to locate casinos entirely on land outside their reservations. The new rules would severely restrict rights of towns and cities to resist tribal annexation of land -- impacting local economic and environmental interests. The rule change could also affect annexation of land by the two federally recognized tribes that operate two of the largest and most profitable casinos in the world. These tribes own property outside of their reservations, and one of the tribes has in the past sought to place such off-reservation land into trust to advance their gaming interests.

Good government and fundamental fairness require that the critical and controversial decisions and rule changes, like the BIA checklist, be subject to public scrutiny that takes account of all the competing interests.

As a first step toward reform, Congress must enact an immediate 6-month moratorium on all Bureau of Indian Affairs tribal acknowledgment decisions or appeals.

This proposal differs significantly from the one I advocated before this committee – years ago, and that Senators Dodd and Lieberman championed courageously, but unsuccessfully. This moratorium would be only temporary -- giving Congress sufficient time and strong impetus to act promptly. A moratorium of limited, defined duration would avoid harm to tribes truly deserving recognition, but it would protect against continued lawless, arbitrary BIA decisions and provide a powerful incentive for reform.

The need for a moratorium was demonstrated dramatically by an internal BIA memorandum -- discovered during review of documents for our administrative appeal in the Schaghticoke decision -- which provides a blueprint for BIA senior officials to disregard and distort the law. The BIA memorandum exposes a concealed world of rigged decisions -- that skirt and subvert the rule of law. This unconscionable pattern and practice cannot be permitted to continue.

The central principle of reform should be:  Tribes that meet the seven legally established criteria deserve federal recognition and should receive it.  Groups that do not meet the criteria should be denied this sovereign status.

In addition to a moratorium, Congress should take the following immediate steps.

First, Congress should demand immediate, complete and accurate disclosure of all lobbyists, lawyers, and others that seek to influence the process and amounts paid to them by petitioning tribal groups or by related financial interests and investors. Sunshine is a particularly powerful disinfectant in this morass of money, politics and personal agendas.

The public must fully understand the extent of gaming influence on recognition. We know some information through the media but complete disclosure is not required by law. The Schaghticoke petitioner is backed by Fred DeLuca, the founder of Subway sandwich shops. DeLuca has reportedly spent $12 million to support the tribe's petition for recognition and related matters. The partnership agreement between DeLuca (Eastlander Group, LLC) and Schaghticoke reportedly provides that in return for his financial support, the Schaghticoke will compensate DeLuca 31.5% of revenues from a future casino, if one is ever built, up to a total of $1 billion over a 15 year period.

Other Connecticut groups seeking federal recognition have similar arrangements.  The Historic Eastern Pequot tribe is backed by William Koch, among one of America's wealthiest people.  Donald Trump backed the Paucatauck Eastern Pequot group but was ousted after the two factions merged as a result of the Final Determination.  Ronald Kaufman, who has close ties to the Bush White House, has reportedly received $700,000 for his lobbying efforts on behalf of

the Eastern Pequots. Thomas Wilmot, a shopping mall developer from Rochester New York, is reportedly backing the Golden Hill Paugussetts, and a casino developer from Minnesota, who was formerly associated with Assistant Secretary - Indian Affairs Dave Anderson, Lyle Berman, supports the Nipmucs.

Present laws require full disclosure of lobbying efforts before Congress. We should require no less information about interests who bankroll groups seeking federal recognition and stand to profit handsomely.

Second, Congress should create a federal agency, the Federal Tribal Recognition Commission -- insulated from politics or lobbying -- to make tribal recognition and trust lands decisions. It must have nonpartisan, disinterested members with staggered terms, and ample resources. The Department of the Interior currently has an unavoidable conflict of interest -- a trustee responsible for advocating and protecting Native American interests but also a supposedly neutral judge determining the merits of recognition claims and resulting benefits.

There is compelling precedent for such an independent agency. The Securities and Exchange Commission, the Federal Communications Commission, and the Federal Trade Commission deal professionally and promptly with topics that require extraordinary expertise, impartiality, and fairness. The Commissioners have no personal stake in the outcome of decisions. Along with independence and authority, the agency must have sufficient resources in staff and other capabilities -- now lacking in the BIA. Without them, federal claims made by a tribal petitioner cannot be effectively and promptly evaluated.

Third, Congress should adopt the tribal recognition criteria in statute, reducing the likelihood that the BIA -- or a new, independent agency -- will stretch or disregard regulatory standards to recognize an undeserving petitioner. Formal enactment also provides a stronger standard on appeal to the courts, and makes a statement about congressional support. One of the most frustrating and startling consequences of the current BIA review process is the manipulation and disregard of the seven mandatory criteria for recognition -- abuses that the General Accounting Office (GAO) and Inspector General reports found have occurred in recent petitions.

Fourth, Congress should also enact measures to ensure meaningful participation by the entities and people directly impacted by a recognition decision -- including equal rights for the towns and cities to all information submitted by all parties.

Citizens and their public officials deserve a meaningful role and voice, beginning with access to relevant information.

Finally, Congress should provide additional, much-needed, well-deserved resources and authority for towns, cities and groups alike to reduce the increasing role of gaming money in the recognition process. Federal assistance is critical, in light of the increasing burdens of retaining experts in archeology, genealogy, history and other areas -- all necessary to participate meaningfully in the recognition process.

I submit the following examples of BIA lawlessness which qualify the agency for admission into the Governmental Hall of Shame:

1. **Deliberate decision to ignore mandatory tribal recognition criteria to grant recognition to the Schaghticokes despite clear lack of evidence supporting the petition.**

In a January, 2004 decision granting federal recognition to the Connecticut-based Schaghticokes, the BIA inexplicably reversed its preliminary denial and found that they met all seven mandatory criteria, despite the lack of any evidence establishing that the group met two of the seven mandatory criteria -- political autonomy and social community -- for long periods of history. The basis for this decision -- which directly conflicted with the preliminary negative decision and prior BIA precedent and regulatory requirements-- remained a mystery until several weeks later, when an internal staff briefing paper became available. The briefing paper created a road map -- as close to a smoking gun as we've seen -- for the agency to reverse its prior negative finding, despite the admitted lack of credible evidence of at least three of the seven mandatory criteria. I have attached that briefing paper to my testimony.

The criteria for federal recognition as an Indian Tribe have been carefully developed over 30 years, based primarily on Supreme Court precedent articulating the relationship of Indian tribes to the federal government. Present legal rules require any group seeking federal recognition to meet seven distinct criteria -- aimed at proving the petitioning group's continuous existence as a distinct community, ruled by a formal government, and descent from a sovereign, historical tribe. Distorting and defying these rules, as the BIA memorandum clearly demonstrates, the BIA's political leaders have disregarded these standards, misapplied evidence, and denied state and local governments a fair opportunity to be heard.

The briefing paper sets forth options to Acting Assistant Secretary Aurene Martin for addressing two issues staff acknowledged were potentially fatal to the Schaghticoke petition: (1) little or no evidence of the petitioner's political influence and authority for two substantial periods of time totaling over a century; and (2) serious problems associated with internal fighting among two factions of the group.

With respect to the lack of evidence, the memo demonstrates its disregard for the legal standards and precedents to arrive at a particular desired result. While acknowledging that Option 2-- declining to acknowledge the group -- would "maintain[] the current interpretation of the regulations and established precedents concerning how continuous tribal existence is demonstrated," the memo suggests a way to achieve a positive finding even though the petition lacks evidence of mandatory criteria for two historical periods: Option 1, which is to "[a]cknowledge the Schaghticoke under the regulations despite the two historical periods with little or no direct political evidence, based on the continual state relationship with a reservation and the continuity of a well defined community throughout its history."

Very simply, declining to acknowledge the group would flow from following the law and the agency's own precedent. Yet, the BIA chose Option 1, granting federal recognition by

substituting state recognition in lieu of evidence for large periods of time. The BIA chose this option despite its own concession that it would create a "lesser standard," and despite the clear evidence in the record showing that the "continual state relationship" was not based on -- and could not satisfy -- federal recognition standards.

This BIA briefing paper confirms that recognition of the Schaghticoke petitioner resulted from the BIA purposefully disregarding its own regulations and long accepted precedents, ignoring substantial gaps in the evidence, and proceeding to "revise," yet again, its recent pronouncements on the meaning and import of the State's relationship with the group. In fact, the BIA has now "revised" the legal import of state recognition at least four times in only two years, each time adopting a view that would permit it to reach the result it wished, regardless of whether the group met the lawful standards.

### 2. Other examples of BIA's willingness to ignore the law and its own regulations and precedents.

In the Eastern Pequot and Paucatuck Eastern petitions, the former head of the BIA unilaterally overturned civil service staff expert findings that the two Indian groups failed to meet several of the seven mandatory regulatory criteria.

Not content to stop there, the BIA went even further in recognizing a single Eastern Pequot tribe in Connecticut comprised of two competing groups-- the Eastern Pequot and the Paucatuck Eastern Pequots-- despite the fact that these groups had filed separate, conflicting petitions for recognition, and despite substantial gaps in evidence in both tribal petitions. In their conflicting petitions, the Eastern Pequots and the Paucatuck Eastern Pequots claimed that the other was not entitled to recognition under the seven mandatory criteria for recognition. After a preliminary finding that neither group met the recognition criteria, the BIA -- in an unprecedented move -- created a third group which they named the "Historic Eastern Tribe" from both competing and conflicting petitions.

The BIA also distorted the state of Connecticut's relationship with these groups to paper over huge gaps in the necessary evidence required to meet the seven recognition criteria.

In December 2004, the BIA admitted that in granting the Schaghticoke recognition it had contravened its own well-established precedents -- using an improper method to calculate the rates of marriage within the group, a critical basis for the recognition decision. Before it acknowledged this error, we had raised it on appeal. This admission was significant because the Final Determination relied on the marriage rates, as incorrectly calculated, to meet certain of the acknowledgment criteria.

### 3. The head of the BIA recused himself from virtually all major decisions.

Shortly after the last Assistant Secretary – Indian Affairs (AS-IA), Dave Anderson, was appointed and confirmed by Congress, he recused himself from all recognition and gaming

decisions as a result of his former ties to Indian gaming (he was a partner in Lakes Gaming and was involved in establishing tribal casinos in the 1990s). Anderson delegated his responsibilities to his deputy, Aurene Martin, who was not confirmed by the Senate. Anderson later resigned and has yet to be replaced.

### 4. Delay, reversal and indecision.

The recognition process takes too long, leaving tribes, states, local communities and the public in limbo for decades. For example, the Golden Hill Paugussetts filed for tribal recognition almost 20 years ago. The BIA initially found that they did not merit recognition. The decision was reversed upon reconsideration. After more than 10 years, the BIA again found the group did not meet the mandatory criteria. Not until a couple of months ago, did the BIA issue its final decision denying federal recognition.

### 5. Unfair and unequal treatment of states and towns in the recognition process.

The BIA provides significant assistance to petitioning groups seeking federal tribal recognition -- even those financed by investors with far greater financial resources to devote to federal recognition than the state, towns and citizens affected by the application. However, the BIA fails to provide basic information to those who may be opposed to the application.

For example, the BIA refused to provide necessary petition documents to Connecticut and local interested parties in the Eastern Pequot/Paucatuck Eastern petitions, forcing the state and towns to sue the BIA in federal district court to compel the agency to produce the records in time for the state and local parties to have a meaningful opportunity to submit comments in the acknowledgment proceeding.

In addition, after the affected towns submitted comments to the BIA on the Eastern Pequots petition, the BIA unilaterally -- and without notice -- altered deadlines for the submission of comments by the towns so that the BIA could accept the petitioner's documents but exclude the towns' comments.

Connecticut's experience with the BIA is not unique. In 2002, the GAO issued a report documenting significant flaws in the present system, including uncertainty and inconsistency in recent BIA recognition decisions and lack of adherence to the seven mandatory criteria. The GAO report also cited lengthy delays in the recognition process -- including inexcusable delays in providing critical petition documents to interested parties such as the states and surrounding towns.

The United States Department of the Interior's Office of the Inspector General (OIG) also found numerous irregularities in how the BIA handled federal recognition decisions. The report documents that the then Assistant Secretary and Deputy Assistant Secretary either rewrote professional staff research reports or ordered the rewrite by the research staff, so that petitioners who hadn't met the standards would be approved. This Assistant Secretary himself admitted that

"acknowledgement decisions are political," although he later expressed concern that the huge amount of gaming money behind groups seeking recognition would lead to petitions being approved that did not meet the standards.

The impact of federal tribal recognition cannot be understated -- underscoring the urgent need for reform. A decision to acknowledge an Indian tribe has profound and irreversible effects on tribes, states, local communities and the public. Federal recognition creates a government-to-government relationship between the tribe and the federal government and makes the tribe a quasi-sovereign nation. A federally recognized tribe is entitled to certain privileges and immunities under federal law: They are exempt from most state and local laws such as land use and environmental regulations. They enjoy immunity from suit. They may seek to expand their land base by pursuing land claims against private landowners, or placing land into trust under the Indian Reorganization Act. They are insulated from many worker protection statutes relating, for example, to the minimum wage or collective bargaining as well as health and safety codes.

Clearly, enactment of the Indian Gaming Regulatory Act (IGRA) more than a decade ago, permitting federally recognized tribes to operate commercial gaming operations, has vastly increased the financial stakes involved in federal recognition, providing an incentive for wealthy non-Indian backers to bankroll the petitions of groups in states where gaming is permitted on the promise of riches once recognition is achieved and casinos are built. Investors in the Schaghticoke and the Eastern Pequot petitions have sunk tens of millions of dollars into the quest for recognition and casinos with the expectation of receiving a substantial portion of future casino revenue. A number of other groups are seeking recognition, most with the avowed intention to own and operate commercial gaming establishments, if approved.

The enormity of interests and financial incentives at stake make even more essential public confidence in the integrity and efficacy of recognition decisions. Sadly, public respect and trust in the current process have been severely damaged. The current system is totally lacking in safeguards to protect the petitioning groups and the BIA from undue influence by monied interests. In addition, the process is shrouded in secrecy. State and local governments and private citizens directly impacted by a recognition application lack effective access to information submitted by the applicant or to the historical evidence and research by BIA staff.

I ask Congress to act swiftly and strongly to reform the system, remove the incentives for abuse, and restore credibility and public confidence in federal tribal recognition.