**EXHIBIT 6**

Summary Under the Criteria and Evidence for

Final Determination for Federal Acknowledgment

of the

Schaghticoke Tribal Nation

Prepared in response to a petition submitted to the Assistant Secretary - Indian Affairs for Federal acknowledgment that this group exists as an Indian Tribe.

Approved: _____  JAN 29 2004
                                    (date)

*[signature: Aurene M Martin]*

Principal Deputy Assistant Secretary - Indian Affairs

Schaghticoke Tribal Nation Final Determination: 1/29/2004

County, New York, showed the households of Benjamin Chickens and Aaron Chappel. Local history narratives indicated that from 1800 to his death in 1856, the Abraham Rice family lived on Schaghticoke Mountain in the Town of Kent, probably on reservation land or former reservation land, but not in the Schaghticoke residential community itself. See the references to "moving of the Rice family living on the mountain 5 miles from the tribe" (Lavin 1967, 69; citing Overseer's report 1867).

The residency data for the period 1801-1850 is not sufficient for a statistical analysis, because there is not adequate information concerning the size of the on-reservation and off-reservation population at any specific date, or even for any given decade, to determine whether more than 50 percent of the Schaghticoke were living in a residential community as defined in 83.7(b)(2)(i). The data in the table compiled by OFA indicates that most of the Schaghticoke earned their living by working off the reservation, in a variety of locations, but that they did maintain ties to the reservation community. Some families, such as those of Rufus Bunker and of Jeremiah Cogswell and his children, resided off-reservation on a permanent basis, either in Cornwall or, after 1840, increasingly in New Milford. However, as will be seen in the presentation of data concerning 1851-1900 below, some of the off-reservation families, including a portion of the Bunkers and Cogswells and a portion of the descendants of Abraham Rice, returned to the reservation after 1850, while other members of these families continued to be traced in the overseer's reports. This data thus contributes to a showing of community for the period 1801-1850, but does not provide evidence under 83.7(b)(2)(i) for purposes of demonstrating political authority or influence under the carryover provision in criterion 83.7(c)(3).

<u>Schaghticoke endogamy analysis, 1801-1850.</u>

The 25 CFR Part 83 regulations state:

> 83.7(b)(2) A petitioner shall be considered to have provided sufficient evidence of community at a given point in time if evidence is provided to demonstrate any one of the following:
>
> . . . .
>
> (ii) At least 50 percent of the marriages in the group are between members of the group.
>
> . . . .
>
> 83.7(c)(3) A group that has met the requirements in paragraph 83.7(b)(2) at a given point in time shall be considered to have provided sufficient evidence to meet this criterion at that point in time.

The PF concluded that the STN met criterion 83.7(b) from 1801 through 1850, but that the evidence did not indicate it met the criterion at the levels defined in 83.7(b)(2) that provide carryover evidence for section 83.7(c) (STN PF 2002, 15-16). The analysis in the PF was based on an analysis of residency (see above) and did not address the level of endogamous marriage

- 22 -

Schaghticoke Tribal Nation Final Determination: 1/29/2004

within the Schaghticoke between those two dates, which under 83.7(c)(3) also can provide sufficient evidence to met 83.7(c)(3).

The STN commented on this aspect of the PF by submitting a report entitled "Schaghticoke Marriage Patterns in the Nineteenth Century" (Austin 8/8/2003a). The STN asserted that, "the average rate of endogamy for the 1800s exceeds fifty percent" (Austin 8/8/2003a, 1). The paper provided an analysis of the marriages of Schaghticoke Indians from the list compiled by Ezra Stiles on October 7, 1789 (Austin 8/8/2003a, 3-11; see also Stiles 1789 in photocopy and two different transcriptions) and, in Appendix A, a "List of Marriages of Schaghticoke Tribal Members Extant from 1776 to 1899" (Austin 8/8/2003a, 20-27). This data was also subdivided into marriages extant 1800-1849, by decade (Austin 8/8/2003a, 28-32, Appendix B) and marriages extant 1850-1899 by decade (Austin 8/8/2003a, 33-37, Appendix C).

The STN asserted:

> There were a total of 90 marriages extant for tribal members between 1800 and 1899. Of these, 53 were endogamous, one was culturally-patterned exogamy, and 36 were exogamous. This means that for the entire 100-year period, fifty-nine percent of tribal members' marriages were endogamous, one percent was culturally patterned exogamous, and forty percent were exogamous. This analysis indicates that the Tribe meets the sufficient level of evidence for community under the tribal acknowledgement [sic] regulations (83.7(b)(2)(ii)) and, therefore, has also met the requirements for 83.7(c)(3) (Austin 8/8/2003a, 12-13).

The OFA staff analyzed the endogamy data, comparing it to other available documents. This analysis added some relationships that must have existed for named Schaghticoke individuals, since the children of the individual were mentioned in the Schaghticoke overseers' account books (Schaghticoke Account Book 1801-1807, Schaghticoke Account Book 1807-1833, Schaghticoke Account Book 1833-1852).[6] (See Appendix I, Table 3.) All dates are on the basis of the best documentation available to OFA. Many dates are approximate (after x or before y), based upon the birth of a child, a census, a last mention in the overseer's ledger, etc. The OFA analysis

---

[6] For purposes of analyzing endogamy, OFA has followed its previous practice of categorizing all known relationships that endured long enough to produce children as "marriages," whether or not there was evidence of a formalized union. Documented unions (formal or informal) that did not produce children are also included in the analysis.

- 23 -

Schaghticoke Tribal Nation Final Determination: 1/29/2004

eliminates some individuals included by STN[7] and adds others, based upon the known birth of a child.

The PF already noted:

> At least from the mid-1800's onwards, only certain descendants maintained contact with each other and the reservation. In each generation, only some of a given set of siblings had descendants who appeared on subsequent lists and descriptions of the Schaghticoke. Substantial numbers of others from the same sibling set did not participate, apparently no longer maintaining "tribal relations" with their relatives or other Schaghticoke (STN PF 2002 Summ. Crit., 17).

The endogamy analysis has taken that phenomenon into account in the following manner:

- If a Schaghticoke parent participated in Schaghticoke activities (was named in the overseers' records, signed petitions, etc.), then the marriages of the children, whether endogamous or exogamous, and whether or not that child subsequently maintained tribal relations, are included in calculating the ratios below.

- If a Schaghticoke individual who entered into an exogamous marriage continued to participate in Schaghticoke activities (was named in overseers' records, signed petitions, etc.), then the marriages of his/her children, whether endogamous or exogamous, are included in calculating the ratios below.

- If a Schaghticoke individual who entered into an exogamous marriage ceased to participate in Schaghticoke activities (was not named in overseers' records, did not sign petitions, etc.), then that individual is presumed to have abandoned tribal relations and the marriages of his/her children are not included in calculating the ratios below.

Thus, as an example, Charlotte (Mauwee) Vandore died in 1835, in tribal relations, since the Schaghticoke overseer paid the expenses of her funeral. One of her daughters never appeared in the Schaghticoke records; the other, Loraine (Vandore) Parrott was mentioned twice, the last time in 1865, although she lived until after 1900 and had descendants who continued to live in the Town of Sharon, Litchfield County, Connecticut, at least through 1915. OFA has made the presumption that this family severed tribal relations as of the date of the final mention in the

---

[7]For example, Levi Suckkonok has been omitted from these calculations, since it appears that he died at some time between 1799 and the opening of the overseer's account book in 1801; also Jo Peny and Eliza, since there is no evidence in the overseer's accounts that Eliza survived past 1800; John Peters and "Old Su" since there is no indication that the "Old Su" mentioned in the overseer's reports in 1825-1826 was the same woman whom Stiles had enumerated as Peters' wife in 1789. It would appear to be improbable that she was, since the presumption would make her 100 years old at time of death. Eunice Wallops is omitted because there is no available evidence that her non-Indian spouse, Brister Dion, survived past 1800.

Schaghticoke Tribal Nation Final Determination: 1/29/2004

overseer's records. Thus, the marriages of Charlotte's daughters are included in the endogamy calculations, but not the marriage of her grandson.

Rufus Bunker and his wife Roxa/Roxanna Mauwee, lived in tribal relations. The known marriages of their children, all of which were exogamous, are included in the calculation of the endogamy ratios, although only some of their children maintained tribal relations subsequent to their marriages.

However, Rufus Bunker's daughter Sarah, in the late 1830's, entered into an exogamous marriage with a man named van Rensselaer (given name not available from the evidence submitted). Sarah (Bunker) van Rensselaer did not appear in Schaghticoke records after the date of her marriage (although her brother Eli did for many more years) nor did any of her descendants appear in Schaghticoke records. Therefore, although evidence was submitted which included the names of some of her descendants, the marriage of her daughter is not included in the endogamy rate calculations below.

Similarly, Abraham "Ned" Rice and his wife Martha Chappel, lived in tribal relations. The known marriages of their children, all of which were exogamous, are included in the calculation of the endogamy ratios, although only some of their children maintained tribal relations subsequent to their marriages. After the death of Abraham Rice in 1856, his widow about 1867, and their daughter Sophia in 1870, no subsequent social ties between this family line and the Schaghticoke are shown in the evidence, although there were descendants in Dutchess County, New York.

Abraham Rice's daughter, Sarah Rice, entered into an exogamous marriage in the late 1830's with a man named William Henry Fowler. Sarah (Rice) Fowler appeared only once in Schaghticoke records after the date of her marriage (although her sister Sophia did for many years)(Overseer's Report 9/1965-12/1865), nor do any of her descendants appear in Schaghticoke records. Therefore, although evidence was submitted concerning the probate of Sophia Rice's estate that contained information concerning Sarah's descendants, the marriage of her daughter is included in the endogamy rate calculations below, but that of her granddaughter is not.

The major distinction in calculation methods, on which OFA's conclusions differ from those of STN, is that STN presumed that unknown, unnamed, individuals were Schaghticoke and contributed to the endogamy rate. OFA, in the absence of positive evidence that a marriage partner was Schaghticoke, has calculated the endogamy percentages on the presumption that unnamed partners were not Schaghticoke unless the partner was independently named in the overseer's account books (as "wife of" a named individual, for example). This is the most conservative method of making such calculations. The second distinction in calculation methods is that OFA included additional unions known from the documents to have produced children, although the second parent was not named or identified. (Also see Appendix I, Table 3, "Schaghticoke Endogamy/Exogamy Patterns 1801-1850.")

Schaghticoke Tribal Nation Final Determination: 1/29/2004

<u>1800</u>. On the basis of the data compiled and summarized in Appendix I, Table 3, which is based on the Schaghticoke overseer's records, vital records, census records, and other available evidence (see the more extensive "Remarks" under each individual in the FAIR database), the Schaghticoke had seven marriages extant in 1800; of those, six were endogamous and for the seventh (Aaron Chappel) there is insufficient evidence to determine which partner was Schaghticoke, nor is there evidence to exclude the possibility that both partners were Schaghticoke. This marriage has been included in the calculations as "presumed exogamous."

In 1800, the Schaghticoke had an endogamy rate of 85 percent (*i.e.*, at least 12 out of 13 or 14 married Schaghticoke were married to other Schaghticoke). This rate is sufficient to demonstrate community for the petitioner under 83.7(b)(2)(ii) as of 1800 and provides carryover to demonstrate political influence or authority for the petitioner under 83.7(c)(3) as of 1800.

<u>1801-1810</u>. Of the endogamous marriages extant in 1800, three were terminated by the death of one partner during the decade 1801-1810, as was the "presumed exogamous" marriage that had existed in 1800. Three of the endogamous marriages that existed in 1800 continued until 1810.

During the decade, there were four new endogamous marriages (one of which ended before 1810), two new exogamous marriages or unions (one of which ended before 1810), and two "presumed exogamous" unions that resulted in the birth of a child (both of which were terminated by the death of the Schaghticoke partner prior to 1810).

Of those Schaghticokes who were married for some portion of the time between 1801 and 1810, 20 were in endogamous marriages and 5 in exogamous or presumed exogamous marriages. This would give an endogamy rate of 80 percent.

The STN asserted that the Schaghticoke endogamy rate for 1800-1809 was 87 percent (Austin 8/8/20031, 14).

OFA calculates that in the year 1810, there were six endogamous and two presumed exogamous marriages extant. Of the marriages extant in 1810, the endogamy rate was 85 percent. By either mode of calculation, the endogamy rate is sufficient to demonstrate community for the petitioner under 83.7(b)(2)(ii) as of 1810 and provide carryover to demonstrate political influence or authority for the petitioner under 83.7(c)(3) for the decade 1801-1810.

<u>1811-1820</u>. During this decade, three of the six endogamous marriages extant in 1810 were terminated by the death of one partner.

During the decade 1811-1820, there were two new endogamous marriages (one of which was terminated before the end of the decade by the death of a partner), one new exogamous marriage, and eight marriages or unions which are presumed exogamous.

- 26 -

Schaghticoke Tribal Nation Final Determination: 1/29/2004

STN asserts that the Schaghticoke had an endogamy rate of 77 percent for 1810-1819 (Austin 8/8/2003a, 14).

OFA calculates that of the Schaghticoke individuals who were married at some time during the decade 1811-1820, 16 lived in endogamous marriages, 2 lived in exogamous marriages, and 8 lived in marriages or unions presumed to have been exogamous. This provides an endogamy rate of 61 percent.

In 1820, the extant marriages consisted of 5 endogamous (10 individuals), 2 exogamous, and 8 presumed exogamous. This is a rate of 50 percent for endogamous marriages as of 1820.

By either mode of calculation, the endogamy rate is sufficient to demonstrate community for the petitioner under 83.7(b)(2)(ii) as of 1820 and provide carryover to demonstrate political influence or authority for the petitioner under 83.7(c)(3) for the decade 1811-1820.

1821-1830. During this decade, one endogamous marriage extant in 1820 was terminated by the death of one partner. At least four presumed exogamous marriages existing in 1820 were terminated by the death of one partner; one was terminated by divorce.

During the decade 1821-1830, there was one new endogamous marriage (two individuals), one new exogamous marriage, and seven new marriages or unions presumed to be exogamous. For the decade, this provides an endogamy rate for new marriages of 10 percent.

The STN asserts that the Schaghticoke endogamy rate for 1820-1829 was 70 percent (Austin 8/8/2003a, 14).

OFA calculates that of the 30 Schaghticoke individuals who were married at some time during the decade 1821-1830, 12 individuals (6 couples) lived in endogamous marriages. This gives an endogamy rate of 40 percent.

In 1830, the extant marriages consisted of 5 endogamous marriages (10 individuals), 2 exogamous marriages, and 12 presumed exogamous marriages. This gives an endogamy rate of 42 percent.

While both of these rates remain substantial and provide evidence for the existence of community, they are below the level required to provide carryover to demonstrate political influence or authority for the petitioner under 83.7(c)(3) for the decade 1821-1830.

1831-1840. During this decade, one endogamous marriage extant in 1830, one exogamous marriage extant in 1830, and six presumed exogamous marriages existing in 1831 were terminated by the death of one partner.

- 27 -

Schaghticoke Tribal Nation Final Determination: 1/29/2004

During the decade 1831-1840, there were two new endogamous marriages (one of which was terminated by the death of one spouse before 1840) and five new exogamous marriages. This gives an endogamy rate of 44 percent for new marriages for the decade.

STN asserts that the Schaghticoke endogamy rate for 1830-1839 was 57 percent (Austin 8/8/2003a, 14).

OFA calculates that of the 31 Schaghticoke individuals who were married at some time during the decade 1831-1840, 12 lived in endogamous marriages. This gives an endogamy rate of 35 percent.

In 1840, the extant Schaghticoke marriages consisted of 5 endogamous marriages (10 individuals), 6 exogamous marriages, and 6 presumed exogamous marriages. This gives an endogamy rate of 45 percent.

While both of these rates remain substantial and provide evidence for the existence of community, they are below the level required to provide carryover to demonstrate political influence or authority for the petitioner under 83.7(c)(3) for the decade 1831-1840.

1841-1850. During this decade, one exogamous marriage existing in 1841 was terminated by the death of one partner.

During the decade 1841-1850, there were three new endogamous marriages (six individuals), one new marriage with another Indian from New York, two new exogamous marriages, and four new presumed exogamous marriages. This gives an endogamy rate for new marriages for the decade of 44 percent.

The STN asserts that the Schaghticoke endogamy rate for 1840-1849 was 67 percent (Austin 8/8/2003a, 14).

OFA calculates that of the 35 Schaghticoke individuals known to have been married at some time during the decade 1841-1850, 19 lived in endogamous marriages. This gives an endogamy rate of 54 percent.

In 1850, the extant Schaghticoke marriages consisted of 8 endogamous marriages (16 individuals), 1 marriage with a non-Schaghticoke Indian, 7 exogamous marriages, and 10 presumed exogamous marriages. This gives an endogamy rate of 47 percent.

Both of these rates remain substantial and provide evidence for the existence of community. For the decade as a whole, the 54 percent endogamy rate is high enough to provide carryover to demonstrate political influence or authority for the petitioner under 83.7(c)(3) for the decade 1841-1850.

Schaghticoke Tribal Nation Final Determination: 1/29/2004

The pattern above is unique for cases thus far evaluated under the 25 CFR Part 83 regulations under criterion 83.7(b)(2)(ii). This is the only case in which endogamy rates appear to have dipped below 50 percent for a portion of the first half of the 19th century (1821-1840) and then to have subsequently risen to above 50 percent for the next three decades (1841-1870) (see below). Part of the explanation lies in the high number of "unknown, presumed exogamous" unions that took place in the 1820's. The other contributory factor is that in the 1830's, numerous children of off-reservation Schaghticoke families reached marriageable age and entered into exogamous marriages.

*Schaghticoke from 1851-1900: evidence for community based on the 50 percent residency or 50 percent endogamy rates that would, if met, provide carryover evidence for 83.7(c).*

Schaghticoke residential analysis 1851-1900.

1851-1860. The overseers' account book and reports for the 1850's and overseer Abel Beach's private ledger for the period 1842-1856, indicate that during this decade, the reservation or near-reservation Schaghticoke settlement in Kent, CT, included Eunice Mauwee, her daughter Lavina Carter, and, at least some part of the time, her granddaughter Laura (Carter) Skickett; John Mauwee; Joseph Mauwee; the household of Parmelia (Mauwee) Kilson, Parmelia's son Alexander Value Kilson and his wife Eliza Jane Kelly and children, Parmelia's daughter Caroline Kilson and her husband Albert Rylas and children, and the household of Truman Bradley (aka Mauwee) and his wife Julia A. Kilson and children; Marianne (Chappel) Kelly, Eliza Jane's mother, and Eliza Jane's two daughters, Mary Jane Kelly and Nancy M. Kelly. In 1852, Parmelia's son Joseph D. Kilson married Mary Jane Kelly; that marriage broke up and in 1857 he married her sister, Nancy M. Kelly, after which he moved to Michigan until about 1865. The 1852-1853 Schaghticoke overseer's report mentioned the above individuals plus Abigail (Mauwee) Harris, Antoinette [unidentified], and several members of Abraham Rice's family (Lavin 1997, 64; citing Connecticut, State of, Count of Litchfield, Superior Court 1855-1924 [JD 1853]).

The evidence of off-reservation residence for Schaghticoke individuals during the 1850's basically indicates that there was no large-scale restructuring: those families that had been in Cornwall remained there; those families that had been in New Milford remained there.[8] (See Appendix I, Table 2.)

---

[8] It should be noted that the documentation submitted does not provide an exact place of birth for many Schaghticoke individuals, but only the state of birth as recorded in various Federal censuses. Similarly, within the Town of Kent, most of the vital records do not indicate whether the family resided on- or off-reservation.

- 29 -