# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | NO. H-85-1078(PCD) |
| v. | ) | |
| | ) | |
| 43.47 ACRES OF LAND, MORE OR LESS, | ) | |
| SITUATED IN THE COUNTY OF | ) | |
| LITCHFIELD, TOWN OF KENT, et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | * * * * * * * * * |
| SCHAGHTICOKE TRIBAL NATION | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | NO. 3-98-CV 01113 (PCD) |
| v. | ) | |
| | ) | |
| KENT SCHOOL CORPORATION, INC., et | ) | |
| al | ) | |
| Defendants. | ) | |
| | ) | * * * * * * * * |
| SCHAGHTICOKE TRIBAL NATION | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | NO. 3-00-CV 0820 (PCD) |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA AND | ) | |
| THE CONNECTICUT LIGHT AND | ) | |
| POWER COMPANY, et al | ) | |
| Defendants. | ) | April 6, 2004 |

FILED
APR 6 II 51 AM '04
U.S. DISTRICT COURT
NEW HAVEN, CONN.

**SCHAGHTICOKE TRIBAL NATION'S
MOTION TO AMEND SCHEDULING ORDER**

### Introduction

The Schaghticoke Tribal Nation ("Tribe") moves the Court to amend the recently-amended May 9, 2001 Scheduling Order (the "Scheduling Order") in these consolidated cases. The motion is necessitated not by the Tribe's desire to reschedule dates but, rather to add language to Paragraph (1) of the Scheduling Order that reflects the clear and unambiguous

**ORAL ARGUMENT REQUESTED**

agreement previously reached between the parties and *amicus*, State of Connecticut, concerning communications or meetings with any officials in the immediate offices of the Secretary of the Interior, the Assistant Secretary-Indian Affairs, or the Deputy Commissioner of Indian Affairs with respect to the Tribe's petition for acknowledgment.

As to the requested amendment, following months of negotiations, including some sessions with the Court, the parties and *amici* agreed to the terms of a Scheduling Order governing these consolidated cases that were ultimately entered by the Court. One provision of the Scheduling Order precludes any non-federal party or *amici* from communicating or meeting with any officials in the immediate offices of the Secretary of the Interior, the Assistant Secretary-Indian Affairs, or the Deputy Commissioner of Indian Affairs with respect to the Tribe's petition for acknowledgment without prior notification to all other parties. *See* Scheduling Order at ¶ (I).[1] This provision was specifically raised with this Court during negotiations. As discussed below, the recent violation of the Scheduling Order by Attorney General Blumenthal necessitates the amendment of the Order to specifically require *two business days prior* notification to all other parties of any such communications or meetings. The parties and *amici* could continue to file such papers, as permitted by the Scheduling Order and the applicable regulations, without prior notice to the parties or the U.S. Attorney's Office.

The Court may wonder why the Tribe's request is necessary, given the months of negotiations between counsel for the parties and *amici* and the clear and unambiguous agreement between all parties that each would give notice to all others before meeting with or communicating with representatives of any of the aforementioned Government offices. The Court justifiably may question why such understandings cannot be honored among counsel. Indeed, requiring all non-federal parties and *amici* to give prior notice to the U.S. Attorney's Office prior to communicating or meeting with the clients of that Office may seem unnecessary,

---

[1] It is generally understood among the parties and *amici* that this provision does not apply to briefs, memoranda and similar papers filed in connection with the administrative proceedings.

given the applicable ethical obligations governing the conduct of counsel in this case, particularly the prohibition on counsel's contact with a represented party.

Prior to agreeing to the terms of the Scheduling Order, the Tribe considered the negotiations with the Court, the parties and *amici* and satisfied itself that the parties' and *amici's* understanding of the Scheduling Order did not require more specific language concerning notice of such meetings and communications with the referenced Government representatives. The Tribe, agreeing to the Scheduling Order, failed, however, to take account of Attorney General Richard Blumenthal's overzealous actions when blinded by a perceived politically-popular position.

On March 17, 2004, in an affront to the spirit of the months-long private negotiations between representatives of his Office, the U.S. Attorney's Office, counsel for the Tribe, and the other parties, Attorney General Blumenthal orchestrated a private, unscheduled meeting with Secretary of the Interior, Gale Norton, in an attempt to derail the very tribal recognition process to which he had agreed and as such, these actions. During that meeting, he also hand-delivered a one-sided letter that distorted the facts of this case and of the recognition process as it relates to the Tribe's petition. A letter was received by the parties and counsel for Secretary Norton days later via U.S. mail. Attorney General Blumenthal's actions demonstrate the rationale for this motion and the need for the amendment of the Scheduling Order.

### Discussion

1.    The Scheduling Order

The Scheduling Order issued by the Court in these consolidated cases concerns the Tribe's petition for tribal acknowledgment pending before the Bureau of Indian Affairs. In sum, it is a case management order under which the Tribe's recognition process is monitored and controlled by the Court. The Scheduling Order was the product of months of intensive negotiations between Attorney General Blumenthal and representatives of his Office, the Office

of the U.S. Attorney for the District of Connecticut, counsel for the Tribe, all other parties and this Court.

The final draft of the Scheduling Order included the following directive to Attorney General Blumenthal and the parties in these consolidated cases:

> No non-federal party or *amici* shall communicate or meet with any officials in the immediate offices of the Secretary of the Interior, the Assistant Secretary-Indian Affairs or the Deputy Commissioner of Indian Affairs with respect to this petition, without notification to the other parties.

*See* Scheduling Order at page 9, ¶ (1).  It was clearly and unambiguously understood by all parties to the negotiations - - and specifically advocated by members of Attorney General Blumenthal's Office - - that "notification" meant prior notification.  Since the issuance of the Scheduling Order, counsel for all the parties - - with the notable exception of Attorney General Blumenthal - - have conducted themselves accordingly.

2.   <u>The March 17, 2004 Meeting</u>

On March 17, 2004, Attorney General Blumenthal and representatives of other states met with Secretary of the Interior Gale A. Norton to discuss, in general terms, the current Tribal recognition process.  *See* Exhibit 1 (March 17, 2004 Press Release from Attorney General Blumenthal).  Following the meeting, however, Attorney General Blumenthal orchestrated a second, apparently unscheduled, private meeting in which he initiated a "spirited and frank" discussion with Secretary Norton concerning the merits of the Tribe's Petition. *Id.*  During the meeting, Attorney General Blumenthal asked for a moratorium on the Tribe's recognition proceedings, including the IBIA appeal - - the very proceedings that are the subject of the Scheduling Order that he negotiated. *Id.*

Attorney General Blumenthal's misconduct purposefully deprived representatives of the Tribe the opportunity to be present during, and participate in, the meeting with Secretary Norton. This misconduct also purposefully deprived counsel for Secretary Norton, in this case, with the opportunity to be present and represent his client's interests. In sum, Attorney General Blumenthal's surreptitious conduct unquestionably seeks to derail the very recognition process that he had negotiated for and agreed to years ago and that is a central focus of these consolidated cases.[2] Even if Secretary Norton does not issue the moratorium requested by Attorney General Blumenthal, there is a very real risk that his comments could taint her future consideration of the Tribe's Petition. What else could be his goal for arranging a private, apparently unscheduled meeting with Secretary Norton?

3.   <u>The March 17, 2004 Letter</u>

In addition, on March 17, 2004, Attorney General Blumenthal hand-delivered a three-page letter to Secretary Norton in which he expressed, in detail, that he was "deeply troubled" by the decision of the Bureau of Indian Affairs to recognize the Tribe. *See* Exhibit 3 (March 17, 2004 Letter from Attorney General Blumenthal to Secretary Norton). Attorney General Blumenthal's letter also concerned an Office of Federal Acknowledgment (OFA) "briefing paper" - - akin to a bench-memo prepared by a law clerk for a judge - - in which OFA presented the former Acting Assistant Secretary for Indian Affairs with an analysis of several issues raised by the Tribe's Petition.[3]

---

[2]   Indeed, it is ironic that, on the one hand, Attorney General Blumenthal characterizes the Bureau of Indian Affairs as a "lawless [agency], ready to twist and distort logic and law in reaching a result driven by money and politics," *see* Exhibit 2, at 1, then, less than five days later, chooses to ignore the letter and spirit of this Court's Order - - the terms of which his Office specifically negotiated for and agreed to - - by arranging for his secret meeting with Secretary Norton in flagrant pursuit of his political agenda. In the Tribe's opinion, the Bureau of Indian Affairs is not the lawless party motivated by politics.

[3]   In fact, all the issues discussed in the "briefing paper" were also discussed in the Final Determination on the Tribe's Petition. Indeed, the "briefing paper" was disclosed to all parties and *amici* in this case, thus

Attorney General Blumenthal's letter threatens the integrity of the very process that he negotiated for and agreed to with respect to the consideration of the Tribe's Petition by the Department of the Interior and the Court. It was never shared with the Tribe, Secretary Norton's counsel in this case, or the other parties before it was delivered, as was required by the Scheduling Order. The letter misconstrues the nature of the "briefing paper" and fails to mention significant facts of which Secretary Norton, in all fairness, should have been advised, to consider the "briefing paper" in context. For example, Attorney General Blumenthal's caustic letter fails to mention that he has been involved in the Tribe's recognition process and land claim cases since their start, it fails to mention that he and his staff have submitted reams of legal briefs and supporting documentation concerning the very issues raised in the "briefing paper," and, significantly, it fails to mention that the letter itself was contrary to the terms of a Scheduling Order that his Office was instrumental in negotiating and which governed both the very recognition process of which the letter complained and the various land claims.

## Conclusion

Based on the foregoing, the Tribe respectfully requests that the Court amend the last sentence of Paragraph (1) of the Scheduling Order to read as follows:

> No non-federal party of *amici* shall communicate or meet with any officials in the immediate offices of the Secretary of the Interior, the Assistant Secretary-Indian Affairs or the Deputy Commissioner

---

undercutting any argument by Attorney General Blumenthal that it represents evidence of a secret conspiracy aimed at recognizing the Tribe, regardless of the evidence. Moreover, in yet another demonstration of Attorney General Blumenthal's fundamental misunderstanding of the recognition process, he apparently fails to comprehend that the "briefing paper" concerns matters on which there was no clear OFA precedent. Just like this Court in similar situations, in the absence of clear precedent, the Acting Assistant of Indian Affairs has very broad discretion to fashion a decision based on available evidence.

of Indian Affairs with respect to this petition, without *two business days prior* notification to the other parties.[4]

In addition, pursuant to the Court's inherent supervisory powers over parties and *amici* and their attorneys, the Tribe requests that the Court make a finding that Attorney General Blumenthal's March 17, 2004 private meeting with and letter to Secretary Norton concerning the Tribe's petition were improper and violated the Scheduling Order. The Tribe also asks that the Court place Attorney General Blumenthal on notice that future violations of the Scheduling Order may result in an order of sanctions, contempt, or similar disciplinary relief.[5]

---

[4] A specific two business day period of prior notification should provide the Tribe ample opportunity to bring to the Court's attention any concerns it may have concerning future meetings Attorney General Blumenthal may intend to request with Secretary Norton or other officials with the Department of the Interior.

[5] It is also noteworthy that the apparent authority for Attorney General Blumenthal to involve himself in this case is Conn. Gen. Stat. § 47-59a, *et seq.*, which vests Attorney General Blumenthal, vis-á-vis his client, the Connecticut Department of Environmental Protection, with certain authority and responsibilities with respect to Native American Lands. Thus, while it is apparent that, as a "friend of the Court," he may be involved in matters relating to the land claims and condemnation aspects of this case, it is questionable whether he may involve himself in matters relating to whether or not the Tribe obtains federal recognition or obtains the right to conduct gaming on its reservation.

Wherefore, the Tribe respectfully requests that the Court grant its Motion to Amend

Scheduling Order and order the requested relief.

THE PLAINTIFF,
SCHAGHTICOKE TRIBAL NATION
BY MCCARTER & ENGLISH, LLC
ITS ATTORNEYS

By _____
Eric Watt Wiechmann (CT 04331)
Peter W. Hull (CT 17230)
CityPlace I
Hartford, CT  06103
(860) 275-6700

and

Thomas Van Lenten, Esq. (CT 10199)
Pinney, Payne, Van Lenten,
Burrell, Wolfe & Dillman, P.C.
Lee Farm Corporate Park
83 Wooster Heights
Danbury, CT  06813-3499
(203) 830-6335

Of Counsel:
Judith A. Shapiro, Esq.
6856 Eastern Avenue NW
Suite 206
Washington, DC 20012

and

Jerry C. Straus, Esq.
Hobbs, Straus, Dean & Walker, LLP
2120 L Street, NW
Washington, DC  20037

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Schaghticoke Tribal Nation's Motion to Amend the Scheduling Order has been mailed, postage prepaid this 6th day of April, 2004 to:

John B. Hughes, Esq.
Chief of Civil Division
United States Attorneys Office
157 Church Street, Floor 23
New Haven, CT 06510

Thomas Van Lenten, Esq.
Pinney, Payne, Van Lenten,
Burrell, Wolfe & Dillman, P.C.
Lee Farm Corporate Park
83 Wooster Heights
Danbury, CT 06813-3499

Judith A. Shapiro, Esq.
6856 Eastern Avenue NW, Suite 206
Washington, DC 20012

David J. Elliot, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT 06103-3499

Loretta Bonos
594 Bendview Drive
Charleston, WV 25314

Jeffrey B. Sienkiewicz, Esq.
Sienkiewicz & McKenna, PC
9 South Main Street
P.O. Box 786
New Milford, CT 06776-0786

Michael J. Burns, Esq.
Law Offices of Attorney Michael J. Burns
57 Pratt Street
Hartford, CT 06103

Jerry C. Straus, Esq.
Hobbs, Straus, Dean & Walker, LLP
2120 L Street, NW
Washington, DC 20037

Giovanna Tiberii Weller, Esq.
Carmody & Torrance
50 Leavenworth Street
P.O. Box 1110
Waterbury, CT 06721-1110

Robert A. Slavitt, Esq.
Slavitt, Connery, & Vardamis
618 West Avenue
Norwalk, CT 06850

James R. Fogarty, Esq.
Fogarty Cohen Selby & Nemiroff
88 Field Point Road, P.O. Box 2508
Greenwich, CT 06836-2508

Susan Quinn Cobb, Esq.
Asst. Attorney General
55 Elm Street
Hartford, CT 06141

Thomas A. Gugliotti, Esq.
Updike, Kelly & Spellacy
One State Street
Hartford, CT 06123

Renita Ford, Esq.
General Litigation Section
Environmental & Natural Resources Division
United States Department of Justice
Post Office Box 663
Washington, DC 20004-0663

Scott Keep, Esq.
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW
Mailstop 6456
Washington, D.C. 20240

_____
Eric Watt Wiechmann (CT 04331)

HARTFORD: 611850.02

-9-

| | | |
|---|---|---|
| [logo] **News from** | | **Office of the Attorney General**<br>**55 Elm Street**<br>**Hartford, Connecticut 06106** |
| **Attorney General** | | |
| **Richard Blumenthal** | | **For**<br>**Immediate**<br>**Release** |

**WEDNESDAY, MARCH 17, 2004**

### *ATTORNEY GENERAL ASKS FOR MORATORIUM ON TRIBAL RECOGNITIONS DURING DC MEETING WITH INTERIOR SECRETARY*

Attorney General Richard Blumenthal today called for an immediate moratorium on all tribal recognition decisions during a meeting with U.S. Secretary of the Interior Gale Norton in her Washington D. C. office. Blumenthal gave Norton a letter outlining his request.

Blumenthal's call for a moratorium was sparked by a recently released Bureau of Indian Affairs (BIA) memo showing that the agency illegally ignored its own regulations to grant the Schaghticoke Tribal Nation federal recognition. BIA is part of the Department of the Interior. The Attorney General expressed his dismay over the memo to Norton both in person and in his letter.

Blumenthal told Norton that he believes there should be an independent investigation to determine whether the memorandum reflects improper or illegal activities.

"The discussion with Secretary Norton was spirited and frank," Blumenthal said. "There was no specific result or decision, but Secretary Norton indicated clear interest and her comments were thoughtful and informed. In my view, this matter now clearly is on her radar screen. I made her aware as well of our congressional delegation's high level of interest, and our shared position that an investigation is warranted. I expressed my belief that there should be a moratorium on recognition proceedings until all the facts are disclosed. Clearly, this matter is not over."

"The BIA's own internal memorandum demonstrates beyond any doubt that the tribal acknowledgement process is completely lacking in credibility, fatally flawed and in need of immediate and substantial reform. I am shocked by the BIA's lack of concern for the rights of the State of Connecticut, its citizens and the interested parties who participated in these proceedings under the apparently mistaken view that their input would be heard and considered fairly. Continuing to tolerate the existing process, which is so obviously flawed and infected by improper influences, threatens irreparable and irrevocable harm to

| **Contact:** | **Christopher Hoffman** | **860-808-5324** |
|---|---|---|

Connecticut and other states. An immediate, full and far-reaching investigation is critical."

"Until a probe can be conducted and completed, I urge Secretary Norton to impose an immediate moratorium on all pending recognition decisions, including any proceedings before the Interior Board of Indian Appeals. The magnitude and severity of the illegal and improper actions described in the memorandum cut to the core of all Interior Department decisions relating to the Schaghticokes and other petitions involving state recognition as a compensating factor for lack of evidence," the Attorney General said.

**\*\*\*END\*\*\***

| Contact: | Christopher Hoffman | 860-808-5324 |

*file Schghticf*

# State of Connecticut



**RICHARD BLUMENTHAL**
ATTORNEY GENERAL

Hartford
March 17, 2004

**RECEIVED** *from*
*176*

APR 0 7 2004

McCarter & English

The Honorable Gale A. Norton
Secretary
United States Department of Interior
1849 C Street, N.W.
Washington, D.C. 20240

Dear Secretary Norton:

I am deeply troubled by an internal Bureau of Indian Affairs (BIA), Office of Federal Acknowledgement (OFA) staff memorandum to former Acting Assistant Secretary for Indian Affairs, Aurene Martin, that apparently led her to reverse her predecessor's negative proposed finding in the Schaghticoke Tribal Nation (STN) petition, and essentially, on the same factual record, to grant the Schaghticoke Tribal Nation's petition for federal acknowledgement. A copy of this memorandum is attached. This "briefing paper" provides yet another example that the tribal acknowledgement process is seriously flawed and requires immediate and comprehensive reform to restore its credibility.

The OFA briefing paper confirms that recognition of Schaghticoke petitioner required the BIA to disregard its own regulations and established precedents, and to "revise," yet again, its recent pronouncements on the meaning and import of the State's relationship with the group, as well as ignore substantial gaps in the evidence. The BIA has now revised its view of the import of state recognition no less than four times in only two years. It has completely, unashamedly reversed the long-standing view that federal recognition could not be based on state recognition alone, moving to its present view that it can actually be a substitute for evidence on critical and mandatory criteria. The BIA has taken this new and revised approach despite substantial evidence in the record to show that the State of Connecticut never viewed or treated the Schaghticoke petitioner as a political entity or social community.

In particular, the briefing paper sets forth options and seeks guidance from the Acting Assistant Secretary with respect to how to address two issues staff acknowledged were potentially fatal to the petition: (1) little or no evidence of the petitioner's political influence and authority, one of the mandatory regulatory criteria, for two substantial historical periods; and (2) serious problems associated with the internal fighting among the two factions of the group. With respect to the lack of evidence issue, the OFA shows, by it's owns words and analysis, its disregard for the legal standards and precedents as demonstrated by one of the four options

March 17, 2004
Page 2

posited by the OFA. OFA posits that one of the options is to: "Decline to acknowledge the Schaghticoke, based on the regulations and existing precedent." In explaining this option, which the OFA and the Assistant Secretary rejected, the OFA explained: "Option 2 [declining to acknowledge the group] maintains the current interpretation of the regulations and established precedents concerning how continuous tribal existence is demonstrated." In other words, declining to acknowledge the group means following the law. Yet, despite this clearly correct legal path, the BIA chose option 1, and acknowledged the petitioner by substituting state recognition in lieu of actual evidence for large periods of time. The BIA chose this option despite its own concession that it would create a "lesser standard."

I am also greatly disturbed by the OFA's lack of concern for the rights of the State of Connecticut, its citizens and the interested parties who participated in these proceedings under the apparent mistaken view that their input would be heard and considered fairly. The memorandum largely justifies adopting a "lesser standard" in violation of the regulations on the ground will have only a limited future precedential value because there are only "six other historically state recognized tribes with a continuously existing state reservation which have not yet been considered for acknowledgement." The State of Connecticut, and all affected by this proceeding have a right to expect that a federal agency, making a decision of this import, will do so by fairly and consistently applying the law.

The BIA's own internal memorandum demonstrates, beyond any doubt, that the tribal acknowledgement process is completely lacking in credibility, fatally flawed and in need of immediate and substantial reform. Continuing to tolerate the existing process, which is so obviously flawed and infected by improper influences, threatens irreparable and irrevocable harm. An immediate, full and far-reaching investigation is critical.

I am joined in this view by Connecticut's congressional delegation, who have requested that the General Accounting Office and the Inspector General undertake investigation of this process. In addition, I will request that the Department of Justice immediately investigate the legality and propriety of the actions that led to this memorandum and the recognition and decision of this matter.

Until a full and fair investigation can be conducted and completed, I urge you to take any available action to impose an immediate moratorium on all pending recognition decisions including any proceedings before the Interior Board of Indian Appeals. The magnitude and severity of the illegal and improper actions described in the memorandum cut to the core of all Interior Department decisions relating to the Schaghticoke and other petitioners involving state recognition as a compensating factor for lack of evidence.

March 17, 2004
Page 3


      I am available to discuss this matter with you at your convenience.

               Very truly yours,


               RICHARD BLUMENTHAL


Attachment


c:  All parties of record:
    Eric Watt Weichmann
    Thomas Van Lenten
    Jeffery Sienkiewicz
    Thomas A. Gugliotti
    Richard Street
    Robert A. Slavitt
    David Elliott
    James R. Fogarty
    Jerry Strauss
    Judith Shapiro
    Michael J. Burns
    Scott Keep
    John Hughes
    Barbara Coen

Schaghticoke Briefing Paper 1/12/2004

## Schaghticoke Tribal Nation: Final Determination Issues

### Introduction
The Office of Federal Acknowledgment (OFA) requests guidance from the ASIA concerning two issues that must be resolved in order to complete the final determination on the Schaghticoke Tribal Nation (STN) (Petitioner #79).

One issue concerns a lack of evidence for political authority for one substantial historical time period and insufficient evidence for a second, longer period. The other issue concerns the refusal of one faction to re-enroll because of opposition to the current STN leadership.

### Background: Proposed Finding versus Final Determination
- Criterion 83.7(b) (community)
    The STN PF found that community had not been demonstrated between 1940 and 1967. With the additional data for the final determination, the STN now meets community for all periods up until 1996 (see *Issue 2* concerning 1996-2001).
- Criterion 83.7(c) (political influence)
    The STN PF found that the group had not demonstrated political influence between 1800 and 1875 and between 1885 and 1967. With the additional data for the final determination, there remains a lack of evidence for criterion 83.7(c) between 1820 and 1840 and insufficient evidence between 1892 and 1936. (see *Issue 2* concerning 1996-2001)
- Criteria 83.7(b) and (c) between 1996 and 2001
    These criteria were not met for the PF because the current STN membership list did not include a substantial portion of the actual social and political community. This faction continues to refuse to re-enroll.

### Issue 1
*Should the petitioner be acknowledged even though evidence of political influence and authority is absent or insufficient for two substantial historical periods, and, if so, on what grounds?*

### Discussion
The petitioner has little or no direct evidence to demonstrate that criterion 83.7(c) has been met between 1820 and 1840 and between approximately 1892 and 1936. The evidence for community during the 1820 to 1840 period, based on a high rate of intermarriage within the group, falls just short of the 50 percent necessary, under the regulations, to demonstrate political influence without further, direct evidence (83.7(b)(2)(ii)).

If applied as it was in the Schaghticoke PF, the weight of continuous state recognition with a reservation would not provide additional evidence to demonstrate that criterion 83.7(c) (political influence) has been met for this time period.

### State Relationship:
The Schaghticoke have been a continuously state-recognized tribe with a state reservation throughout their history. They have had a special status in Connecticut as a distinct political

Schaghticoke Briefing Paper 1/12/2004

community, although there was not evidence of a government-to-government relationship with Connecticut throughout the entire historical span. The state relationship with them has been an active one, and was active during both of the time periods with little direct evidence of political influence. That activity (overseers, reservation maintenance, legislation and appropriations) did not extend to direct dealings with Schaghticoke leaders or consultation with the group on group matters during the time periods in question.

*Unique Circumstances for Evaluation.*

➤ There is no previous case where there is little or no direct evidence of political influence within the group for extended periods even though the existence of community is well established throughout the petitioner's entire history, including the two periods when evidence of political processes is very limited.

➤ There is no previous case where a petitioner meets all of the criteria from earliest sustained contact for over 100 years, does not meet one of the criteria during two separate, substantial historical periods and then meets all of the criteria for a substantial period up to the present (subject to *Issue 2*).

*General Requirements of the Regulations*

The regulations require demonstration of a "substantially continuous tribal existence" (83.3(a)). Under 83.1, "Continuously or continuous means extending from first sustained contact with non-Indians throughout the group's history to the present substantially without interruption."

The regulations provide that a petitioner shall be denied if there is insufficient evidence that it meets one or more of the criteria (83.6(d)).

*Additional Background Information*

Acknowledgment of the Schaghticoke would give them standing in the current litigation to procede with their Non-Intercourse Act land claim.

The deficiencies found in the petitioner's case are similar to, though less extensive, than found by researchers for the petitioner in earlier stages of preparation of the petition. Their reports are included in the record reviewed.

*Options*

1. Acknowledge the Schaghticoke under the regulations despite the two historical periods with little or no direct political evidence, based on the continual state relationship with a reservation and the continuity of a well defined community throughout its history.

2. Decline to acknowledge the Schaghticoke, based on the regulations and existing precedent.

3. Acknowledge the STN outside of the regulations.

2

AC V012 D0009  Page 2 of 5

Schaghticoke Briefing Paper 1/12/2004

4. Decline to acknowledge the STN, but support or not object to legislative recognition.

*Discussion of Options*

o  Option 1 would require a change in how continuous state recognition with a reservation was treated as evidence in the STN PF and in the Historical Eastern Pequot (HEP) decisions. The STN PF stated that state recognition in the Schaghticoke case did not provide additional evidence for political influence in the periods in question in part because there were no known State dealings with Schaghticoke leaders. In addition, the position in the HEP decisions and the STN PF was that the state relationship was not a substitute for direct evidence of political processes, and can add evidence only where there is some, though insufficient, direct evidence of political processes.

The revised view, under Option 1, would be that the overall historically continuous existence of a community recognized as a political community by the State (a conclusion denied by the State) and occupying a distinct territory set aside by the state (the reservation), together with strong evidence of continuous community, provides sufficient evidence for political influence even though direct evidence of political influence is absent for some periods.

Recognition of STN under Option 1 would not affect past negative decisions because the clear continuity as a community together with the continuous historical state relationship and reservation are not duplicated in petitioners that have been rejected in the past. There are no more than six other historically state recognized tribes with a continuously existing state reservation which have not yet been considered for acknowledgment.

Option 1 may be interpreted by petitioners as establishing a lesser standard which would be cited in some future cases, if the STN decision is interpreted as allowing substantial periods during which evidence is insufficient on one criterion. Its impact on future cases would be limited by the weight given the state relationship and the continuity in community.

o  Option 2 maintains the current interpretations of the regulations and established precedents concerning how continuous tribal existence is demonstrated.

o  Option 3, acknowledgment outside the regulations, would require an explicit waiver of at least part of the regulations, based on a finding that this was in the best interests of the Indians. A waiver could be narrowly defined to distinguish this case from other potentially similar future cases.

o  Option 4 would probably be strongly opposed by the Connecticut delegation.

*Recommendation*
The OFA recommends Option 1 on the grounds that it is the most consonant with the overall intent of the regulations.

3

Schaghticoke Briefing Paper 1/12/2004

*Issue 2*
*Should the STN be acknowledged (subject to decision on Issue 1) even though a substantial and important part of its present-day social and political community are not on the current membership list because of political conflicts within the group?*

*If STN is acknowledged, who should be defined by the Department as included within the tribe acknowledged?*

*Discussion*
The STN membership list does not include a substantial portion of the actual social and political community. The activities of these individuals were an essential part of the evidence for the PF's conclusion that the STN met criterion 83.7(b) and 83.7(c) between 1967 and 1996 and their absence was one of the reasons the PF concluded these criteria were not met from 1996 to the present. After 1996, these individuals either declined to reenroll as the leadership required of all members, or subsequently relinquished membership, because of strong political differences with the current STN administration.

STN negotiations with these individuals during the comment period did not resolve this issue. They have refused offers of the STN to consider them for membership. The STN has created a list of 43 individuals, not currently enrolled, who it considers to be part of their community. The OFA concludes there are 54, based on different estimates of family size but comprising the same group as identified by the STN. The current STN membership is 273.

The OFA's concern is that the current status of a long-term pattern of factional conflict may either have the undesirable consequence of negatively determining Schaghticoke's tribal status, or of disenfranchising part of its actual membership if acknowledged.

*Authority to Acknowledge*
The PF stated that "The Secretary does not have the authority to recognize part of a group" (citing HEP final determination which acknowledged two petitioners as together forming the historical tribe).

*Options:*
    1. Acknowledge the STN as defined by its current membership list (assumes *Issue 1* is decided in favor of acknowledgment).

    2. Acknowledge the STN but define the base roll membership of the tribe acknowledged as those on the current membership list <u>and</u> the specific body of 54 additional individuals. This body is defined in the determination based on past enrollment and past and continuing social and political involvement (assumes *Issue 1* is decided in favor of acknowledgment).

    3. Decline to acknowledge the STN as not the complete group.

4

Schaghticoke Briefing Paper 1/12/2004

*Discussion of Options*

º Option 1:  If the current STN membership is acknowledged, the additional 54 individuals, who meet the petitioner's own membership criteria, would qualify to be added to the base roll under 83.12(b).  This section defines the membership list of a tribe as acknowledged as becoming the base roll and states that additional individuals maintaining tribal relations may be added to that base roll.  This option leaves some authority with the existing leadership to accept or reject these individuals.

º Option 2:  Past decisions, before the HEP FD, treated a petitioner's membership list as the definition of the community to be acknowledged or denied acknowledgment.  The HEP FD combined two membership lists into one.  This option would go farther, including in the group's membership individuals who have not specifically assented to or been accepted as members, albeit appearing on past membership lists.  The PF stated "The purpose of the regulations is to provide for the acknowledgment of tribes, not of petitioners per se."

º Option 3:  Depending on the resolution of *Issue 1*, this would disqualify an otherwise eligible petitioner because of its factional conflicts.  Potentially, the STN and the faction could remedy this deficiency by combining and appealing to IBIA on the grounds of new evidence which would change the decision (83.11(d)(1)).

*Recommendation*
The OFA recommends Option 2, as consistent with the intent of the acknowledgment regulations.

Prepared by Office of Federal Acknowledgment, 1/12/2004

K:\BAR\Schagticoke-FD\SchagFDBrief

5

Lee Fleming
01/06/2004
05:33 PM

To: Aurene Martin/DC/BIA/DOI@BIA, Theresa
Rosier/DC/BIA/DOI@BIA
cc: George Roth/DC/BIA/DOI@BIA, Virginia
DeMarce/DC/BIA/DOI@BIA, Rita
Souther/DC/BIA/DOI@BIA, BARBARA
COEN/HQ/SOL/DOI@DOI
Subject:    Briefing for Schaghticoke, Petitioner
#79

☐ Return receipt

Aurene & Theresa,

We were able to schedule a briefing for both of you on issues
pertaining to the Schaghticoke petition for Federal Acknowledgment as
an Indian tribe. The purpose of this briefing is to present you with
two specific issues regarding this case and to obtain your direction on
these issues. These two issues will set precedence and OFA needs
your direction to complete the Final Determination recommendation.

We are preparing a briefing paper addressing these issues, complete
with options, and will provide you this briefing paper on Monday,
January 12, 2004. Then, on Tuesday, January 13, 2004, in the
Assistant Secretary's conference room at 10:00 a.m., the OFA research
team, our solicitors, and I will provide you the briefing on these issues.

Either at the end of the briefing or shortly there after, we would like to
receive your directions regarding these issues. Your prompt attention
will allow us to complete our work on the Final Determination
recommendation.

We anticipate that the packet for the Final Determination
recommendation will enter into the surname process during the week
of the January 19th. Under the court-approved negotiated agreement,
the decision regarding the Schaghticoke petition is due on January 29,
2004.

Theresa, if your schedule permits, I also would like to meet with you tomorrow to talk about the roll out of this decision as it pertains to the court-approved negotiated agreement, such as 1) what time will we call the petitioner and interested parties, followed by Congressionals and the media on the 29th, 2) when to fax some of the decision documents, either the evening of the 29th or the morning of the 30th, and 3) when to allow for pick-up of the decision documents after 3:00 p.m. on the 30th or Fedex to those who do not pick-up by 5:00 p.m. that same day.