# EXHIBIT I

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


UNITED STATES OF                    CIVIL ACTION
AMERICA,                            NO. H-28-1078(PCD)
                Plaintiff,

        vs.

43.47 ACRES OF LAND, MORE
OR LESS, SITUATED IN THE
COUNTY OF LITCHFIELD, TOWN
OF KENT, it al,
                Defendants,

SCHAGHTICOKE TRIBAL                     ********
NATION
                Plaintiff,      CIVIL ACTION
                                NO. 3-98-CV01113(PCD)
        vs.

KENT SCHOOL CORPORATION,
INC., et al
                Defendants.

SCHAGHTICOKE TRIBAL             CIVIL ACTION
NATION,                         NO.3-00-CV0820(PCD)
                Plaintiff,

        vs.

THE UNITED STATES OF
AMERICA AND THE
CONNECTICUT LIGHT AND
POWER COMPANY, et al
                Defendants.     JULY 15, 2005


Shirley A. Riga, License No. 447
DEL VECCHIO REPORTING SERVICES
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE, MADISON, CT 06443
203 245-9583  800 839-6867
FAX 203 245-2760

HARTFORD            NEW HAVEN            STAMFORD

DEL VECCHIO REPORTING SERVICES, LLC

1                Deposition of:   DOLORES SCHIESEL,

2     taken pursuant to subpoena and the Federal Rules of

3     Civil Procedure before Shirley A. Riga, Registered

4     Professional Reporter, Licensed Shorthand Reporter and

5     Notary Public within and for the State of Connecticut,

6     at the offices of McCarter & English on July 20, 2005,

7     commencing at 9:00 a.m.

8

9

10    APPEARANCES:

11    (Please see Page 3.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEL VECCHIO REPORTING SERVICES, LLC

1    A.    Wyrick.

2    Q.    Ms. O'Dea-Wyrick's connection with TASK?

3    A.    I was concerned that because the town was in

4    litigation and she was a selectman, that there could

5    be an appearance of a problem and issues raised that

6    would not be for the best for the town.

7    Q.    What kind of problem?

8    A.    I'm not even sure that I could define

9    exactly what kind of problems.  I think sitting here

10   today might be a good example of what could evolve

11   from that kind of problem.

12   Q.    What do you mean by that?

13   A.    That we are in the middle of this deposition

14   because there seems to be a connection between TASK

15   and the town, and I was concerned that that would be a

16   perception.  So I wasn't concerned that it existed,

17   but that the perception could cause the town problems.

18   Q.    Based on your understanding of Judge

19   Dorsey's order, would it be a violation, based on your

20   understanding, would it be a violation of that order

21   for the Town of Kent to use TASK as an intermediary to

22   communicate with the office of the Secretary of the

23   Interior?

24   A.    I answered that question already, I think.

25   Using an intermediary for any of the parties to make

DEL VECCHIO REPORTING SERVICES, LLC

1    contact without the proper notice would be a violation

2    of the order, but that wasn't my concern with Ms.

3    O'Dea-Wyrick or with TASK.   My concern was the

4    perception and the possible problems it could create

5    for the town.

6         Q.    Okay.   The next document which I guess is

7    number 27, a January 25th -- what do we call it, a

8    desk notebook.   Is that this document?

9         A.    Yes.

10               MR. REIF:   Let's get that marked

11    please.

12               (STN-21, offered and marked for

13               identification.)

14    BY MR. REIF:

15    · Q.    What portion of STN-21, Ms. Schiesel, refers

16    to the Schaghticoke issues?

17         A.    It's above that squiggly line, the 1/25/05

18    conversation with Leigh Gomez.

19         Q.    Okay.   It says the notes -- this is all in

20    your handwriting?

21         A.    Uh-huh.

22         Q.    It says spoke with Bradley Blakeman oppose

23    Schaghticoke.   What did that note mean to you at the

24    time?

25         A.    To me that note means she had spoken with

1     Q.    Let me go back, if I might, and let's go

2   back to some of the meetings that you've talked to me

3   about, and let's start with the meeting at the Fife &

4   Drum.  Was that the first time you met anybody from

5   Barbour and Griffith?

6     A.    Yes.  Oh, no.  I'm sorry.  That's not fair

7   to say that.  I met them that morning.

8     Q.    Okay.

9     A.    Of the same day.

10     Q.    Where?

11     A.    In Hartford.

12     Q.    Where in Hartford?

13     A.    We met at the Governor's, a conference room

14   near the Governor's office.

15     Q.    Did you attend any meeting with any of the

16   Governor's staff that day?

17     A.    Yes.

18     Q.    Did you meet with the Governor herself or

19   the staff?

20     A.    Staff.

21     Q.    Who?

22     A.    I didn't take notes of that meeting, and I'm

23   not sure who was in attendance.

24     Q.    Was Griffith and Barbour there?

25     A.    Yes.

1    Q.    Were any --

2    A.    Representatives, excuse me.   There is no

3    Griffith and Barbour that I know of.

4    Q.    Okay.   Fair enough.   Who from Griffith and

5    Barbour?

6    A.    Brad Blakeman and Loren Monroe and the third

7    gentleman whose name I don't --

8    Q.    The blond man we talked about?

9    A.    The younger blond guy.

10    Q.    Okay.   Anybody there from TASK?

11    A.    Yes.

12    Q.    Who?

13    A.    To my recollection Ken Cooper and Jim

14    Perkins.

15    Q.    Other than people from the Governor's staff,

16    the people from Griffith and Barbour, you and Mr's.

17    Cooper and Perkins, anybody else there?

18    A.    Senator Roraback was there, and I don't

19    remember anyone else, but there may have been people

20    in and out.

21    Q.    What was the purpose of that meeting?

22    A.    To, well I was a guest at the meeting so I

23    don't know that I can speak directly to what the

24    purpose was.

25    Q.    Based on what you saw while you were there,

DEL VECCHIO REPORTING SERVICES, LLC

```
1   what was the purpose?

2       A.   To brief the Governor's staff on who TASK

3   was, what their goals were and what the Schaghticoke,

4   their issues were.

5       Q.   What do you recall being said regarding the

6   goals of TASK?

7       A.   Generally they wanted to assure a fair

8   process for the recognition given the direct threat to

9   Kent.

10      Q.   Fair process before whom?

11      A.   For recognition.

12      Q.   I'm sorry.  Before --

13      A.   For recognition in general.

14      Q.   In general, okay.

15    · A.   And then also any legislative, if they had

16  legislative agendas.

17      Q.   Were those federal legislative agendas and

18  or state agendas?

19      A.   Primarily state speaking with the Governor's

20  office.

21      Q.   You said primarily, was there discussion --

22      A.   I think it was focused entirely on state

23  then.

24      Q.   When you say a fair process, would that have

25  included -- for recognition, would that have included
```

DEL VECCHIO REPORTING SERVICES, LLC

1    the pending proceedings before the BIA?

2        A.    I don't remember in particular a discussion

3    of that.

4        Q.    Was there discussion in general regarding

5    proceedings before the BIA?

6        A.    In general, yeah.

7        Q.    Okay.  And there was no -- we can agree that

8    the list of people that you gave to me were all -- let

9    me withdraw the question.

10        .        There were no people there who were

11    discussing recognition of any tribe other than the

12    Schaghticokes, correct?

13        A.    No.  I don't think I said that.

14        Q.    Was there specific -- was there specific

15    discussion of recognition of any tribe other than the

16    Schaghticokes?

17            MR. SIENKIEWICZ:  Objection to the form

18    of the question.

19            MR. REIF:  Okay.  Withdraw it.

20    BY MR. REIF:

21    '  Q.    Did you discuss the fact that there was a

22    Schaghticoke application pending?

23        A.    Yes.  The Town of Kent was affected by the

24    pending Schaghticoke.

25        Q.    Did you discuss the fact that there were any

```
 1    other -- that there were applications pending by any
 2    other tribes?
 3         A.    Yes.
 4         Q.    Which other tribes?
 5         . A.    I don't know of any tribe in particular, but
 6    the discussions with the state invariably talk about
 7    the fact that there are a number of pending petitions.
 8         Q.    All right.  But the only specific tribe that
 9    you recall being discussed by name were the
10    Schaghticokes; is that fair?
11         A.    I wouldn't say only.  I don't recall other
12    ones by name, but I can't say it was only.
13         Q.    There were no selectmen there from any town,
14    any other town except Kent, correct?
15         A.    Correct.
16       · Q.    The only tribe at this point with a petition
17    pending that is located that has lands located in Kent
18    is the Schaghticokes?
19                    MR. SIENKIEWICZ:  Objection.
20                    THE WITNESS:  No, that's not --
21    BY MR. REIF:
22         Q.    Okay.  Are there any other tribes with land
23    located in Kent that have an application pending other
24    than the Schaghticokes?
25                    MR. SIENKIEWICZ:  Objection to the form
```

1    of the question.

2                      MR. REIF:   Noted.

3    BY MR. REIF:

4        Q.   Go ahead.  You can answer.

5        A.   The Schaghticokes Indian Tribe has a pending

6    petition and that reservation for which they claim is

7    located in Kent.

8        Q.   Okay.  So the pending applications are

9    Schaghticoke Indian Tribes, Schaghticoke Tribal

10   Nations that have land in Kent?

11     . A.   Yes.  Well --

12                    MR. SIENKIEWICZ:   I am going to object

13   to the question.  When you say they have land in Kent.

14   They don't have land in Kent.  There is a reservation

15   set aside by the State of Connecticut in Kent.

16                    THE WITNESS:   I would like to correct

17   my response?

18   BY MR. REIF:

19       Q.   Okay.  I will take that correction.  What do

20   you recall specifically being discussed regarding the

21   process of recognition?

22      ˙ A.   I don't recall anything specific.

23       Q.   In general, what do you recall regarding the

24   process of recognition being discussed?

25       A.   The issues with -- the general issues of the

1  Bureau, the revolving door problems, the Freedom of

2  Information issues and timeliness of responses.  Very

3  broad general discussions.

4     Q.    Anything else other than revolving door and

5  FOI?

6     A.    Probably were, but I don't recall.

7     Q.    So the only two that you recall are the

8  revolving door and the FOI issues?

9     A.    Right.

10           MR. SIENKIEWICZ:  Was there an answer

11  on that.

12           MR. REIF:  I'm sorry?

13           THE WITNESS:  Yes.

14  BY MR. REIF:

15     Q.    What do you recall being discussed regarding

16  a legislative agenda?

17     A.    I don't recall any specifics.

18     Q.    Did you notice at that meeting whether the

19  people from Griffith and Barbour were taking any

20  notes?

21     A.    I didn't notice.

22     Q.    Did you notice if Mr. Cooper was taking any

23  notes?

24     A.    No, I didn't notice.

25     Q.    Did you notice if Mr. Perkins was taking any

1   notes?

2       A.   No, I didn't.  I wasn't paying attention.

3       Q.   Did you notice if Senator Roraback was

4   taking any notes?

5       A.   No, I didn't notice.

6       Q.   Before going into that meeting, did you have

7   any discussions with the people -- with the people who

8   were at the meeting regarding what was going to take

9   place?  Badly asked question.  I will take it out and

10  shoot it and try again.

11           Did you actually meet at the State

12  Capital that morning?

13      A.   Yes.

14      Q.   Where in the State Capital?

15      A.   In the hallway outside the conference room.

16      Q.   How long before going into the conference

17  did you meet?

18      A.   I don't know.  It could have been 5 minutes.

19  Could have been -- we were waiting for people maybe

20  5 minutes.

21      Q.   Before that meeting had you had any

22  discussion with Mr. Cooper regarding what was going to

23  happen at that meeting?

24      A.   No, I didn't.

25      Q.   How about with Mr. Perkins?

1      A.    No.

2      Q.    How about with Mr. Roraback?

3      A.    No.

4      Q.    Before that meeting, had you ever spoken

5  with anybody from Griffith Barbour at all?

6      A.    I think you already asked that, didn't you?

7    . Q.    I may have.

8      A.    Okay.  No.  When I met them.

9      Q.    Okay.

10           MR. HUGHES:  Did you put a date on this

11  meeting.

12  BY MR. REIF:

13      Q.    When was the meeting?

14           MR. SIENKIEWICZ:  She said it was the

15  morning of the Fife & Drum meeting.

16           THE WITNESS:  Yeah, it was the same day

17  as the Fife & Drum.

18      .      MR. SIENKIEWICZ:  So that was January

19  --

20           THE WITNESS:  January --  what did we

21  come up with on that.  January 20, 21st.  21st I think

22  it is.

23           MR. REIF:  We can dig back through the

24  e-mails regarding the Fife & Drum.

25           THE WITNESS:  Yeah.  The fax S-19 has

1    the date of the Council of Governors has the date.  I

2    think it's the 21st.

3    BY MR. REIF:

4         Q.    Who invited you?

5         A.    To what?

6         Q.    Who invited you to the meeting at the

7    Governor's office?

8         A.    Jim Perkins.

9         Q.    Did he say why you were being invited?

10        A.    Specifically, no.

11        Q.    Generally?

12        A.    As for Selectman of the Town of Kent.

13      · Q.    Now after the meeting at the Governor's --

14   in the Governor's conference room that morning, did

15   you have any other meeting?  Did you meet at all with

16   the people from Griffith Barbour between that meeting

17   and the Kent meeting?

18        A.    No.

19        Q.    So after the Governor's meeting you went

20   your separate way?

21        A.    Yes.

22        Q.    And everybody else went their separate way?

23        A.    Yes.

24        Q.    When did you next see any of the people from

25   Griffith and Barbour?

1        A.    No, nothing specific.

2        Q.    Was there any public access TV at that

3    meeting?

4        A.    No.

5      · Q.    Do you know if anybody was making any voice

6    recording of that meeting?

7        A.    I don't know of any.

8        Q.    When did you next meet with anyone from

9    Barbour Griffith after the TASK meeting?

10        A.    I am working off of recollection here and I

11    have to say in my job with so many meetings, so many

12    people, I don't want to make the mistake but I don't

13    have -- you're talking recollection with Barbour

14    Griffith people?

15        Q.    Yes, ma'am.

16      · A.    Until I was in Washington DC for the

17    hearings.

18        Q.    That was the day the McCain hearings?

19        A.    The day before.  I flew in a day early.

20        Q.    The day that you flew in, did you meet with

21    anybody from Griffith Barbour?

22        A.    Yes.

23        Q.    Where?

24        A.    At their offices.

25        Q.    How long of a meeting?

1      A.    I would probably say about an hour and a

2   half.

3      Q.    What did you understand the purpose of the

4   meeting to be?

5      A.    Set up schedules or sort of set up what was

6   happening with the hearing.  They wanted a copy of the

7   testimony that I'd prepared and I had to run it over

8   to Senator Dodd's office, but and at that point Mr.

9   Cooper had his testimony and that's when I read his.

10  It was prepared.  They weren't looking for my input or

11  anything.  Gave me lunch.

12     Q.    Okay.  Were there any revisions made to your

13  testimony that day?

14     A.    No.

15     Q.    Were there any revisions made to Mr.

16  Cooper's testimony?

17     A.    I have no idea.

18     Q.    Did you discuss Mr. Cooper's testimony?

19     A.    I read it.  I didn't discuss it to any --

20     Q.    Did you talk about it at all or just read

21  it?

22     A.    I may have talked about it, but they weren't

23  taking my input.

24     Q.    Do you remember anything you said about it?

25     A.    No.

1      Q.    Who was present at that meeting?

2      A.    I think just Loren, possibly Brad and Ken

3   Cooper and Jim Perkins.

4      Q.    Anybody else from the town other than you?

5      A.    No.

6    · Q.    After that meeting the day before the McCain

7   hearings, when did you next see anybody from Griffith

8   Barbour?

9      A.    Can I ask you a question?

10      Q.    Do you want to step out?

11      A.    Yes.

12      Q.    Okay.  We can go off the record.

13                THE VIDEOGRAPHER:  Going off the record

14   at 2:43 p.m.

15                    (Off the record.)

16                THE VIDEOGRAPHER:  Back on the record

17   at 2:44 p.m.

18                MR. SIENKIEWICZ:  I think Lorry would

19   like to -- Mrs. Schiesel would like to clarify her

20   testimony regarding this meeting in Washington.

21                MR. REIF:  Okay.

22                MR. SIENKIEWICZ:  I think the way you

23   asked the question is not exactly what's been

24   transpiring.

25                MR. REIF:  Sure.

DEL VECCHIO REPORTING SERVICES, LLC

1          .          THE WITNESS:  I wanted to clarify

2     because you didn't exactly.  In addition to meeting at

3     Barbour Griffith, we then with Brad Blakeman and not

4     Loren, the three of us, Jim, Ken and I also went over

5     and met with somebody at the White House.

6          Q.   Okay.

7          A.   I don't want to leave anything out but you

8     didn't --

9     BY MR. REIF:

10         Q.   That's fine.  So after you left Barbour

11    Griffith on the day before the McCain hearings, you

12    then went to the White House?

13         A.   That same group, right.

14    .     Q.   Okay.

15         A.   It's part of the same, so the same almost

16    2 hours was involved in both meeting and then going

17    over.

18         Q.   With whom did you meet at the White House?

19         A.   I don't know his name.  He was a staff

20    person in intergovernmental affairs.  I should

21    remember his name, but I don't.

22         Q.   I'm sorry?

23    .     A.   I should remember his name, but I don't.

24         Q.   How long did that meeting last?

25         A.   Probably 15 minutes.

1          Q.    What was discussed at that meeting?

2          A.    The recognition process.  The impacts on

3    Kent if it were to have a recognized tribe.

4          Q.    Anything else?

5          A.    That there were pending petitions and just

6    Schaghticoke.

7          Q.    Anything else?

8          A.    No, that was --

9          Q.    So your recollection at that meeting was

10    that there was discussion of the recognition process,

11    the impact on Kent, if there was recognition of the

12    Schaghticoke Tribal Nation and the pending petitions?

13          A.    And what TASK was.  Obviously, you don't

14    show up there and not explain what TASK is.

15          Q.    Okay.  Anything else?

16          A.    And, you know, just about the structure of

17    the Bureau, the secretary and the mention of the

18    vacancy.  Nothing came out of the discussion but it

19    was mentioned.

20          Q.    When you say the Bureau, you mean the BIA?

21          A.    The Department of the Interior.

22          Q.    Okay.  Anything else?

23          A.    No.  That's all I remember.

24          Q.    At whose suggestion did you attend that

25    meeting at the White House?

DEL VECCHIO REPORTING SERVICES, LLC

1     A.    Ken Cooper's.

2     Q.    Did Mr. Cooper say why he wanted you there?

3     A.    No, he didn't say.

4     Q.    Did Mr. Cooper say whether it was at Barbour

5   Griffith's suggestion that you attend?

6     A.    He didn't say.

7     Q.    After the White House meeting, where did you

8   go next?

9     A.    I left those two gentlemen and I went by

10   myself over to Senator Dodd's office, Senator

11   Lieberman's office, delivered my testimony to both

12   offices.    I don't think I went to Representative

13   Johnson's that day.

14     Q.    Was there anybody with you when you went to

15   Senator Dodd's office?

16     A.    No.

17     Q.    Did you meet with anybody at Senator Dodd's

18   office?

19     A.    Yes, I met with a staff person.    I met with

20   Shawn Maher.

21     Q.    Did anybody go with you when you went to

22   Senator Lieberman's office?

23     A.    No.

24     Q.    Did you meet with anybody at Senator

25   Lieberman's?

DEL VECCHIO REPORTING SERVICES, LLC

1      A.    Yes.  I met with a gentleman named Joe, but

2  I don't remember Joe's last name.

3      Q.    Did you have an appointment?

4      A.    No, I just dropped in.

5      Q.    Did you have an appointment with Senator

6  Dodd's office?

7      A.    No, but Shawn knew I was coming into town.

8      Q.    Do you know if anybody from TASK met with

9  anybody from Senator Dodd's office?

10     A.    I don't know what their schedule was at the

11  times I was with them.

12     Q.    Do you know if they met with anybody from

13  Senator Lieberman's office?

14     A.    I don't know what their schedule was.

15     Q.    Other than the meeting at Griffith Barbour

16  and the meeting at the White House, were you at any

17  other meetings that day where anybody from Griffith

18  Barbour was present?

19     A.    No.

20     Q.    Other than the Griffith Barbour meeting, the

21  meeting in Griffith Barbour's office and the White

22  House meeting were you at any other meetings where

23  either Mr. Perkins or Mr. Cooper was present?

24     A.    No.

25     Q.    Was there -- did you join either Mr. Perkins

1    or Mr. Cooper or Griffith Barbour people for dinner

2    that evening?

3        · A.    I did have dinner with Ken Cooper and Jim

4    Perkins.

5        Q.    Did you discuss with them at all the day's

6    events?

7        A.    Yeah.  I'm sure we did.

8        Q.    If I had a meeting at the White House --

9        A.    I'd probably talk about it --

10        Q.    -- I'd probably talk about it.

11        A.    Yeah.

12        Q.    Did they tell you at all about any

13    discussions they had had with the Griffith Barbour

14    people about strategy?

15        A.    No.  This was the same day that the airplane

16    had invaded -- no, that was the next day.  No.  We

17    just talked about the White House.  We didn't talk a

18    lot about substance.

19        Q.    Do you remember anything that they told you

20    about their conversations with the people at Griffith

21    Barbour?

22        A.    No.

23        Q.    Do you know where -- after you left the

24    White House, did the people from -- did Mr. Perkins

25    and Mr. Cooper leave with the people from Griffith

169

1    Barbour?

2         A.    They left with Brad.  They may have -- again

3    I don't know their schedules, but they may have been

4    over to the other Senate and house.  I don't remember

5    them mentioning it.  I don't remember them talking

6    about whether they had, but they knew that guy Joe,

7    and they knew what he looked like so he must have been

8    there at Senator Lieberman's, so yeah, I guess they

9    were there.

10        Q.    Do you know whether Griffith Barbour called

11   Senator Dodd's office and told them that you were

12   going to be coming over?

13        A.    They didn't.  They wouldn't have even known.

14        Q.    Do you know if they called Senator

15   Lieberman's office?

16        A.    No.

17        Q.    No?

18        A.    No.  I did that on my own.

19        Q.    Now the day after you were at the White

20   House was the day of the McCain hearing, is that

21   correct?

22        A.    Yes.

23        Q.    That's the hearing for which you submitted

24   testimony?

25        A.    Yes.

DEL VECCHIO REPORTING SERVICES, LLC

1    Q.   You attended?

2    A.   Yes.

3    Q.   Did you gather with anyone else before you

4    went to the hearing?

5    A.   No.

6    Q.   Okay.  So you went directly from your hotel

7    to the hearing?

8    A.   My daughter's apartment.

9    Q.   Okay.

10   A.   To the hearing.

11   Q.   Pardon?

12   A.   My daughter's apartment to the hearing.

13   Q.   Okay.  Did you gather with anyone else at

14   the hearing before you went in?  In other words, did

15   you meet Mr. Perkins there?

16   A.   Senator Dodd and Senator Lieberman and

17   Governor Rell and all of the Connecticut

18   representatives were in a meeting prior to the

19   hearing, and I was waiting in the hallway for that

20   hearing to end, for that meeting to end and we were

21   all together.  I don't know if that, I wouldn't call

22   that personally -- I wouldn't call it a meeting or

23   anything else, but we were all together.

24   Q.   Who was all together?

25   A.   Ken and Jim and I but another group of

1    people were around but there was not a conference or

2    discussions or anything.

3        Q.   How long were you at the hearing?

4        A.   For the full length of the hearing.

5        Q.   Did it run through lunch; was there a lunch

6    break?

7        A.   No.  It ended before lunch, and then a plane

8    came over and that whole bit.  We were out of there

9    before then and that was, I guess, that was around

10   noon or something.

11       Q.   After you left the hearing, did you fly home

12   that day?

13       A.   No, I didn't.

14       Q.   After the hearing did you meet with anybody

15   from the Barbour Griffith office?

16       A.   No.

17       Q.   After the hearing did you meet with -- after

18   the hearing did you talk with anybody from Barbour

19   Griffith?

20       A.   Well in the hall we mingled, you know.  Not

21   Barbour Griffith or maybe Barbour Griffith.  We were

22   mingling in the hall.

23       Q.   What do you recall about those

24   conversations?

25       A.   That's over and we're out of here.