# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| · UNITED STATES OF AMERICA, Plaintiff, | CIVIL ACTION NO. H-28-1078(PCD) |
| vs. | |
| 43.47 ACRES OF LAND, MORE OR LESS, SITUATED IN THE COUNTY OF LITCHFIELD, Town of Kent, et al, Defendants, | ▢ ORIGINAL |
| SCHAGHTICOKE TRIBAL NATION Plaintiff, | ******** CIVIL ACTION NO. 3-98-CV01113(PCD) |
| vs. | |
| KENT SCHOOL CORPORATION, INC., et al Defendants. | |
| SCHAGHTICOKE TRIBAL NATION, Plaintiff, | CIVIL ACTION NO.3-00-CV0820(PCD) |
| vs. | |
| THE UNITED STATES OF AMERICA AND THE CONNECTICUT LIGHT AND POWER COMPANY, et al Defendants. | JULY 15, 2005 |

Shirley A. Riga, License No. 447
DEL VECCHIO REPORTING SERVICES
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE, MADISON, CT 06443
203 245-9583  800 839-6867
FAX 203 245-2760

**HARTFORD**          **NEW HAVEN**          **STAMFORD**

DEL VECCHIO REPORTING SERVICES, LLC

2

1          Deposition of:  NANCY O'DEA-WYRICK,

2   taken pursuant to subpoena and the Federal Rules of

3   Civil Procedure before Shirley A. Riga, Registered

4   Professional Reporter, Licensed Shorthand Reporter and

5   Notary Public within and for the State of Connecticut,

6   at the offices of McCarter & English on July 21, 2005,

7   commencing at 9:00 a.m

8

9

    APPEARANCES:
10
    (Please see Page 3.)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEL VECCHIO REPORTING SERVICES, LLC

1      A.    Yes.

2      Q.    For those time periods?

3      A.    Yes.

4              MR. REIF:  Let's get those marked, if

5    we might, as 47A and B please.  A being 2004.  B being

6    2005.

7              (Exhibit STN-47A, 2004 Calendar; STN-47B

8              2005 Calendar, offered and marked for

9              identification.)

10             MR. REIF:  Okay.  Thanks.

11   BY MR. REIF:

12     Q.    Let me ask you to take a look at those

13   calendars, and I assume this is Town appointments,

14   personal appointments, life?

15     A.    Yes.

16     Q.    Okay.  Let me ask you to go through, if you

17   would, for June 2004.  I notice that there is an

18   appointment -- what would appear to be an appointment

19   on June 6th that says 4 o'clock TASK; am I correct?

20     A.    Yes.

21     Q.    Was that a meeting that you attended on that

22   day?

23     A.    Yes.

24     Q.    Where did that take place?

25     A.    I don't remember.

1     Q.    Was it a public meeting or a private

2  meeting?

3     A.    It was not publicized as a public meeting,

4  but anyone was welcome to come.  It wasn't listed in

5  the newspaper or anything like that.

6     Q.    So if somebody knew about it and showed up,

7  you wouldn't lock the door but you didn't -- it was

8  not publicized?

9     A.    Yes.

10     Q.    Do you remember who -- was it at a public

11  place or was it at somebody's home; do you remember

12  that?

13     A.    I don't recall which it was that day.

14     Q.    Who was present?

15     A.    A variety of people.

16     Q.    Whom do you remember being present?

17     A.    Paul Duly, Ken Cooper.  There were a number

18  of people there.  I just --

19     Q.    Well, sort of in your mind's eye going

20  around the room, do you remember anyone other than

21  Mr. Duly and Mr. Cooper?

22     . A.    The nature of the meetings were such that

23  whoever wanted to show up, simply showed up, and the

24  mix of who was there would change.  So to be that

25  specific on that day, I didn't have a list or notes or

1    anything of who was there.

2        Q.    I understand that, and what I'm asking you

3    to do is sort of look back.   I mean, you remember Mr.

4    Duly was there.   You remember Mr. Cooper was there.

5        A.    Yes.

6        Q.    Is there anyone else that you remember being

7    there?

8        A.    Not specifically.

9        Q.    How about -- when you say not specifically,

10    you're telling me that the only -- and I'm not trying

11    to put words in your mouth -- you're telling me the

12    only people you specifically remember being at that

13    meeting were you, Mr. Duly and Mr. Cooper?

14        A.    But I know there were more people.   I

15    just --

16        Q.    Fair enough.   Approximately how many people?

17        A.    Maybe ten to fifteen.

18        Q.    Did you take any notes at that meeting?

19        A.    Yes.

20        Q.    Do I have copies of those notes in those

21    material?

22        A.    No, because it was after the 14th -- it was

23    before the 14th of June.

24        Q.    Fair enough.   Let's start with June 14th.

25    Let me ask you to go through the week of June 13th.

1    with Schaghticoke recognition or this litigation?

2        A.    No.

3        Q.    Okay.   The meeting on Friday the 16th, where

4    did that meeting take place?

5        A.    I don't remember.

6        Q.    Do you remember who was -- was that a public

7    meeting in the sense that it was advertised beforehand

8    or was it not advertised?

9        A.    I don't even remember what the meeting

10   specifically was, where, who.

11       Q.    Do you have any notes of that meeting?

12       A.    No.

13       Q.    Then two days later on the 18th at 4 o'clock

14   there is another TASK meeting?

15       A.    Yes.

16       Q.    Do you recall who was present at that

17   meeting?

18     . A.    No.

19       Q.    Where it took place?

20       A.    I'm not sure.

21       Q.    Do you have some recollection as to where

22   that one may have taken place?

23       A.    It may have been in the Town Hall meeting

24   room.

25       Q.    If a meeting, is the Town -- on weekends,

DEL VECCHIO REPORTING SERVICES, LLC

1    and let's forget during the week; on weekends is the

2    Town Hall meeting room normally made available for

3    private groups?

4        A.    Yes.

5        Q.    Do they pay any kind of maintenance charge

6    or anything?

7        A.    No.

8        Q.    Do they have to make -- is there a calendar

9    kept somewhere of the groups that are meeting in Town

10   Hall?

11       A.    Somewhat.

12       Q.    Okay.  Where is that list kept?

13       A.    There is a list that the Board of

14   Selectmen's secretary keeps of the regular meetings.

15       Q.    Okay.  Those are -- those are -- when you

16   say regular meetings, what do you mean?

17       A.    Well, I think, you know, planning and zoning

18   meets on Thursday.  You know, the blanks meet the

19   third Thursday of the month at 7:30.  That sort of a

20   list.

21       Q.    The one that you just gave me is a public

22   board?

23       A.    Uh-huh.

24       Q.    I guess my question is, is there a list

25   anywhere kept of nontown groups, and by that I mean

1    not boards, not commissions, not library board, but

2    nontown groups that meet in Town Hall?

3                   MR. SIENKIEWICZ:  I'm going to object

4    to the form of the question.  Are you referring to

5    groups that are not part of town government?  The town

6    little league and the town --

7                   MR. REIF:  Sure.  Let me clear it up.

8    BY MR. REIF:

9        Q.    Groups that are -- you gave me an example of

10   say planning and zoning or planning.  What I'm asking

11   about is groups that are not a part of the town

12   government.  Do they normally -- does the Town

13   normally give them permission to meet in Town Hall on

14   weekends?

15       A.    Yes.

16       Q.    Okay.  And is there a list kept somewhere of

17   groups that are not Town affiliated, and by that I

18   mean they are not down town governmentally affiliated,

19   that meet in Town Hall?

20       A.    I don't know.

21       Q.    If for a reason having nothing to do with

22   litigation, you wanted to find out if some group met

23   back in 2004 in Town Hall that was not a town

24   government but that met in Town Hall, to whom would

25   you go?

1    A.    I'd go to the selectmen's office.

2    Q.    And check with the secretary or somebody?

3    A.    Or the first selectman, whoever was in the

4    office.

5    Q.    Okay.  That meeting on July 18th, did you

6    take any notes at that meeting?

7    A.    No, I don't think I did.

8    Q.    If you did, would they be in this package?

9    A.    Yes.

10    Q.    Could you take a look for me then and see if

11    you did?

12    A.    That package is in chronological order.

13    Q.    Thank you.

14    A.    Current to --

15        MR. SIENKIEWICZ:  Backwards.

16        THE WITNESS:  Yeah.

17        MR. REIF:  Okay.

18        THE WITNESS:  It's July 18th if you go

19    chronologically.  I tried to underline.

20        MR. SIENKIEWICZ:  It's at the back.

21        THE WITNESS:  Current to past.  So the

22    most recent is at the top.

23    BY MR. REIF:

24    Q.    This is the stack I have.

25    A.    Yes.

1       Q.    And my -- the oldest thing that I have in my

2    stack appears to be July 14, 2005?

3       A.    May I explain?

4       Q.    Sure.

5       A.    My printer broke.

6       Q.    Okay.

7       A.    And I had to send everything to Town Hall to

8    be printed out.

9               MR. SIENKIEWICZ:  For this deposition.

10              THE WITNESS:  For this deposition.  So

11   all the e-mails have that date on the top, which is

12   why if you go down to the next addressee, and I've

13   tried to underline the dates to keep things in

14   semblance of order.

15              MR. REIF:  Got it.  Thank you.

16              MR. SIENKIEWICZ:  Is this document that

17   you're looking for.

18              MR. REIF:  Got it.  Thank you.  Let's

19   get that marked if you will.

20              (STN-48, offered and marked for

21              identification.)

22   BY MR. REIF:

23      Q.    On Exhibit 48, the handwriting is all yours?

24      A.    Yes.

25      Q.    Let me work my way down on a couple of

1  things.  I see something that says National

2  Coordination, quote, Friends of Kent, closed quote.

3  Then has Roz Mulho and your name.  What was national

4  coordination of friends of Kent?

5       A.   We went through -- we meaning they, Roz --

6  went through newspaper articles that we got mostly

7  on-line or people would forward to us, and we were

8  looking for other small communities that were in a

9  similar situation to Kent's, looking to see if there

10 were names of people in the articles that it might be

11 appropriate to contact at some point, and basically

12 putting together a listing of who those people were,

13 what the -- whatever it was going on in their

14 community that might have had some synergy with Kent.

15      . Q.   Were you an officer of TASK at any point?

16      A.   No.

17      Q.   Did you hold any positions with TASK other

18 than National Coordination of Friends of Kent?

19      A.   No.  And I wouldn't say it was a position.

20 It was more that was a project that I was willing to

21 work on.

22      Q.   Okay.  Do you know why you ended up being

23 the person doing that project rather than someone

24 else?

25      A.   I volunteered.

1    Q.    Okay.  Was there a reason that you

2  volunteered for that particular project rather than

3  for some other project?

4    A.    It was something I could do.  It was

5  research.

6    Q.    Okay.  Were any of these other projects

7  research?

8          MR. SIENKIEWICZ:  I am going to object

9  to the form.  Any of the other projects listed on this

10  agenda?

11          MR. REIF:  Yeah.

12          MR. SIENKIEWICZ:  Okay.  If you know.

13          THE WITNESS:  Yeah, I'm just looking.

14  Not that I know of.

15  BY MR. REIF:

16    Q.    Did you contact any other -- any other towns

17  as part of the National Coordination program?

18    A.    One.  I didn't contact the town, I contacted

19  a person.

20    Q.    Okay.  When you -- what town was that?

21          MR. SIENKIEWICZ:  I am about to object

22  on the grounds that we're exceeding the scope of the

23  limited discovery that Judge Dorsey has allowed in

24  this case.  I will let you go a little bit longer.

25          MR. REIF:  That's fair enough.

1    BY MR. REIF:

2        Q.    Do you have a copy of your contact e-mail or

3    contact letter?

4        A.    It's dated 1/05 and it's actually folded

5    over at the bottom.  It's a legal size sheet.  It's

6    the only one in there.  It should be near the top.

7                MR. SIENKIEWICZ:  The question is do

8    you have a copy of the letter or person who you

9    contacted.

10                THE WITNESS:  I had the name of the

11    person on here which is why I needed to refer to this.

12    BY MR. REIF:

13        Q.    That's the document we're talking about?

14        A.    Yes.

15                MR. REIF:  Let's get that marked,

16    please, as 49.

17                (Exhibit STN-49, Spread Sheet,

18                offered and marked for identification.)

19    BY MR. REIF:

20        Q.    Tell me what is STN-49.  It's a spread

21    sheet?

22        A.    Yes.  This is the spread sheet that I

23    kept -- put together with Roz which was compiling the

24    information that I described from the newspaper

25    articles that we Googled or people sent to us and then

1   going on-line to find the names or addresses of who

2   was in a particular area that might be appropriate to

3   contact at some point.  The one person I contacted

4   was, Page 3, and it's the second New York.  If you go

5   down the left-hand column it shows the states.

6         Q.    Okay.

7         A.    It was the second New York entry, and I

8   talked to Richard Ricky.

9         Q.    That's the Waterloo Seneca County?

10        A.    Yes.

11        Q.    When -- did you contact Mr. Ricky in writing

12  or by e-mail or just by phone?

13        A.    I called him from home.

14        Q.    When you called him from home, did you

15  identify yourself -- in whatever ways you identified

16  yourself, did you mention that you were a selectman of

17  the Town of Kent?

18        A.    I identified myself first as who I am and

19  then explained all of what I was, too.  I didn't want

20  to pretend I was somebody I wasn't.

21        Q.    Sure.  And all -- when you explained all of

22  what you were, one of the things that you explained is

23  that you were a selectman in Kent, correct?

24        A.    Yes, I would have said that especially since

25  he was on the board of supervisors.

1      Q.   Okay.  I am just curious because I can't

2   completely read your writing on 48.  There are

3   two words that you've written with a star next to

4   them, next to coordination.  The second word is

5   elephant I think.  What's the first one?

6      A.   Eat.

7      Q.   What does "eat elephant" mean?

8      A.   The number of newspaper articles that were

9   sent were voluminous.  I was choking on the

10   information.  So it was taking a long time to go

11   through the articles.  This meeting was the 18th of

12   July and this spread sheet was produced in January.

13   If that gives you any indication.

14      Q.   Okay.

15            MR. REIF:  Can we go off the record for

16   a second.

17            THE VIDEOGRAPHER:  Going off the record

18   at 10:01 a.m.

19            (Off record discussion.)

20            MR. REIF:  Let's go back on the record.

21            THE VIDEOGRAPHER:  Back on the record

22   at 10:01.

23            MR. REIF:  Great.  Thanks.

24   BY MR. REIF:

25      Q.   Let's go back and use our calendar as a

1        A.    No.

2        Q.    Other than the 10th and the 19th, any other

3    meetings -- and whatever may have happened at the

4    Board of Selectmen, any other meetings that dealt with

5    Schaghticoke Tribal Nation including recognition or

6    the pending litigation?

7        A.    No.

8        Q.    October.  Same question.

9        A.    On the 14th I met with a woman regarding

10    newspaper articles.

11        Q.    When you say regarding -- and that's Margo?

12        A.    Yes.  It says TASK, Margo, coffee.

13        Q.    Coffee being an event, not her last name?

14        A.    Right.

15        Q.    Okay.  When you say regarding newspaper

16    articles, what do you mean?

17        A.    She was willing to take newspaper articles

18    and look up addresses, contact information for people

19    who were mentioned in the articles and assisting with

20    the building of that worksheet that you saw.

21        Q.    There's also a TASK meeting on the 17th,

22    correct?

23        A.    Yes.

24        Q.    Did you attend that one?

25        A.    Yes.

1       Q.   In your material, do we have notes of that?

2       A.   Yes.

3       Q.   These?

4       A.   Yes.  Let me double-check just to be sure.

5  Here, yes.

6     .         MR. REIF:  Let's get this marked

7  please.

8           (Exhibit STN-51, offered and marked for

9           identification.)

10  BY MR. REIF:

11      Q.   STN-51 is a set of notes -- two pages of

12  notes that you took at that meeting of October 17th?

13      A.   Yes.

14      Q.   Looking at the note that says Washington

15  update, what do you -- what do you recall Mr. Cooper

16  saying at that meeting regarding the Washington

17  update?

18      A.   Specifically, nothing.

19      Q.   Do you have a note that says January will be

20  a big month.  Does that refresh your recollection?

21      A.   That could have been in regard to any number

22  of things.

23      Q.   I'm not asking what it could have been in

24  regard to yet, although I will, my question is does

25  that refresh your recollection specifically as to what

1   that was about?

2        A.    No.

3        Q.    Do you recall whether, at that meeting,

4   there was any discussion regarding the retention of a

5   lobbying firm in Washington by TASK?

6        A.    Not specifically.

7        Q.    At some point did you -- do you remember

8   attending any TASK meetings where there was discussion

9   regarding the retention of a lobbying firm in

10  Washington?

11       A.    Yes.

12     . Q.    When was -- when do you remember that first

13  coming up at any TASK meetings?

14       A.    I don't specifically recollect when.

15       Q.    Do you remember if it was before the meeting

16  at the Fife & Drum?

17       A.    Yes.

18       Q.    When I say the Fife & Drum, I'm talking

19  January 2005 meeting, correct?

20       A.    Yes.

21       Q.    So it was sometime prior to that

22  January 2005 meeting?

23     . A.    Yes.

24       Q.    Was it before or after Thanksgiving of 2004,

25  can you give me that time frame?

1     A.    Before Thanksgiving.

2     Q.    Yes, ma'am.  It was before Thanksgiving?

3     A.    Yes.

4     Q.    Do you remember if it was before or after

5  Labor Day, 2004?

6     A.    No.

7    . Q.    Okay.  When do you, in connection with any

8  TASK meeting, first recall hearing a reference to the

9  firm of Barbara Griffith?

10    A.    I'm sorry, would you repeat that?

11    Q.    Sure.  When do you first remember in any

12  reference to TASK retaining the firm of Barbara

13  Griffith?

14    A.    January.

15    Q.    So the first time that you ever heard of

16  that firm in connection with TASK was at the Fife &

17  Drum meeting?

18    · A.    No, it was before that.

19    Q.    Okay.  When did -- how did -- when did you

20  first hear that the firm of Barbara Griffith either

21  had been retained or was being considered by TASK?

22    A.    I don't remember.

23    Q.    Okay.  Do you remember if you first heard of

24  that at a meeting of TASK, or do you remember if you

25  first heard of it in some other way, by telephone, by

1    e-mail?

2        A.    I don't remember if it was at a TASK meeting

3    or if it was by phone or by e-mail.   I don't remember

4    when it first --

5        Q.    What's the -- in the context of TASK, when

6    is the first -- tell me what you remember about your

7    first hearing about Barbara Griffith?

8        A.    In --

9        Q.    In the context of TASK?

10       A.    Would have been in regard to the Fife & Drum

11   meeting.

12       Q.    When you say in regard to the Fife & Drum

13   meeting, what do you mean?

14       A.    That they would be -- people from there

15   would be at the Fife & Drum.

16       Q.    Were you ever involved in any discussions at

17   a TASK meeting as to whether retaining a Washington

18   lobbyist would be an appropriate thing for TASK to do?

19       A.    Yes.

20       Q.    Can you give me a context of -- and is that

21   something that you considered to be a good idea?

22       A.    Didn't know.

23       Q.    Did you express an opinion?

24       A.    Didn't really know if that was the thing to

25   do or not.

1    Q.    What did you understand -- from being at the

2    TASK meetings?

3    A.    Uh-huh.

4    Q.    What did you understand TASK's purpose in

5    retaining a lobbyist in Washington was?

6    A.    To work to make the process, you know, more

7    open, more transparent, put it into law, those sorts

8    of things.

9    Q.    Specifically in relation to Schaghticoke

10   Tribal Nation?

11   A.    No, in general.

12   Q.    Including Schaghticoke Tribal Nation?

13   A.    Yeah.

14   Q.    And what -- did you have any understanding

15   as -- let me withdraw the question.

16         And as you understood what they would be

17   doing, what Barbara Griffith would be doing would be

18   contacting people on Capitol Hill?

19         MR. SIENKIEWICZ:  I'm going to object

20   to the form of the question.  I think it's misleading.

21   I think you -- the prior question had to deal with

22   generally the idea of hiring a lobbyist and now I

23   guess we're jumping back to January.

24         MR. REIF:  Fair enough.  I will

25   withdraw and ask it differently.

BY MR. REIF:

 1      Q.    What -- what bodies in Washington did you

 2 understand TASK -- and I'm talking initially when

 3 there were first discussions about a lobbyist, was

 4 there any discussion about what entities in Washington

 5 that lobbying group would be working with?

 6      A.    Congress and senators.

 7      Q.    Was there any discussion -- up until the

 8 time that you first met Barbara Griffith, was there

 9 any discussion at any TASK meeting that you attended

10 about having the lobbyists contact the BIA?

11      A.    No.

12      Q.    Was there any discussion regarding having

13 the·lobbyists try to impact in any way BIA's decision

14 as to the Schaghticokes?

15      A.    Yes.  It would have been implied.

16      Q.    Okay.  Basically, would you agree with me,

17 that TASK's purpose wasn't just sort of generally BIA

18 issues but, in fact, the purpose was to effect BIA's

19 decision as to the Schaghticoke application?

20      A.    Yes.

21      Q.    Let's go back to the calendar.  Let me just

22 ask, does BI -- does TASK have -- let me withdraw the

23 question.

24            How does, if you know, does TASK finance

108

1      A.    No. It was just explained to me, that's all.

2      Q.    And as it was explained to you, you

3   understood that as a selectperson of the Town of Kent,

4   you could not contact anyone of those -- any of those

5   specified people at the Bureau of Indian Affairs or

6   the Department of Interior without two days notice,

7   correct?

8      A.    Yeah.

9      Q.    And would you agree with me that you

10  wouldn't be able to -- it would be a violation of that

11  order for you to write something out and hand it to

12  somebody and say I can't go to Bureau of Indian -- I

13  can't go to those individuals but I want you to take

14  this message with my words and hand it to one of those

15  people; would you agree that that would be a violation

16  of that order?

17     A.    Do I understand it to be that way?

18     Q.    Yes, ma'am.

19     A.    Yes.

20     Q.    And likewise, would you agree with me that

21  you wouldn't be able to say to someone, I want you to

22  memorize the following message and carry that to one

23  of those named individuals at BIA; would you agree

24  with that?

25     A.    I guess that would apply too.

DEL VECCHIO REPORTING SERVICES, LLC

1        Q.   Okay.  Would you agree with me that you

2    wouldn't be able to basically give a message to

3    someone, and I don't mean verbatim, but the context of

4    a message and say, we can't contact BIA but I want you

5    to get this information to BIA; would you agree that

6    that would be a violation of the order?

7        A.   I guess it could be.  I'm not a lawyer, so.

8        . Q.   Understood.  Based on your understanding of

9    the order as it was explained to you, would it be a

10   violation of that order for the Town of Kent to use

11   TASK as an intermediary to convey -- to communicate

12   with those specific individuals?

13               MR. SIENKIEWICZ:  I will object to the

14   question.

15               MR. REIF:  Okay.

16               MR. SIENKIEWICZ:  She can answer.

17   BY MR. REIF:

18       Q.   You can answer.

19       A.   Would you repeat it please?

20       Q.   Sure.  Would you agree with me that it would

21   be a violation of that order for the Town of Kent, as

22   a party to this litigation, to use TASK as a message

23   carrier to the Bureau of Indian Affairs?

24       A.   Yes.

25       Q.   Okay.