# EXHIBIT M

```
               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT


  UNITED STATES OF                CIVIL ACTION
  AMERICA,                        NO. H-28-1078(PCD)
          Plaintiff,

      vs.

  43.47 ACRES OF LAND, MORE
  OR LESS, SITUATED IN THE
  COUNTY OF LITCHFIELD, Town
  of Kent, it al,
          Defendants,

  SCHAGHTICOKE TRIBAL                      ********
  NATION
          Plaintiff,             CIVIL ACTION
                                 NO. 3-98-CV01113(PCD)
      vs.

  KENT SCHOOL CORPORATION,
  INC., et al
          Defendants.

  SCHAGHTICOKE TRIBAL             CIVIL ACTION
  NATION,                         NO.3-00-CV0820(PCD)
          Plaintiff,

      vs.

  THE UNITED STATES OF
  AMERICA AND THE
  CONNECTICUT LIGHT AND
  POWER COMPANY, et al
          Defendants.             JULY 15, 2005

       DEPOSITION OF SENATOR ANDREW RORABACK
                    JULY 26, 2005


        Shirley A. Riga, License No. 447
        DEL VECCHIO REPORTING SERVICES
       PROFESSIONAL SHORTHAND REPORTERS
   117 RANDI DRIVE, MADISON, CT 06443
        203 245-9583   800 839-6867
              FAX 203 245-2760

HARTFORD          NEW HAVEN          STAMFORD
```

DEL VECCHIO REPORTING SERVICES, LLC

```
 1              Deposition of: SENATOR ANDREW
 2   RORABACK, taken pursuant to subpoena and the Federal
 3   Rules of Civil Procedure before Shirley A. Riga,
 4   Registered Professional Reporter, Licensed Shorthand
 5   Reporter and Notary Public within and for the State of
 6   Connecticut, at the offices of McCarter & English on
 7   July 26, 2005, commencing at 9:00 p.m.
 8        .
 9
     APPEARANCES:
10
     (Please see Page 3.)
11
```

1    A.    Yes.

2            MR. REIF:  Let's get this marked,
3    please.
4            (Exhibit STN-76, handwritten notes,
5            offered and marked for identification.)
6    BY MR. REIF:
7    Q.    Let me show you Exhibit 76.  Is that your
8    handwriting?
9    A.    Yes, it is.
10   Q.    When were those notes taken?
11   A.    I believe they were taken at a meeting that
12   was held at the Attorney General's office.
13   Q.    Can you tell from that note when that
14   meeting occurred?
15   A.    I can't tell from the note when it occurred,
16   no.
17   Q.    You said you have with you your appointment
18   books from 2004 to 2005?
19   A.    Yes.
20   Q.    Would referring to that book help you?
21   A.    It might.  It probably would, but I --
22   Q.    Could you check for me?
23   A.    Yeah.  This is -- I don't create my calendar
24   with a view towards ever having to go back.  I live
25   going forward.  Sometime last fall probably.  I think

```
 1   it was a cold day, as I recall.  Maybe Monday -- my
 2   calendar on Monday, October 25th there is an entry
 3   that says 2 p.m. Jim Perkins.
 4       Q.  That's October 25, '04?
 5       A.  Yes.
 6       Q.  Is there anything that indicates to you
 7   whether you and Mr. Perkins met at the Attorney
 8   General's office?
 9       A.  There is nothing on my calendar.  There is
10   nothing on my calendar to indicate that.
11       Q.  Okay.  I'm sorry.  Did I interrupt you?
12       A.  I just, for the record, I met with
13   Mr. Perkins on several occasions, but this would be
14   my -- as I look back in time, this time period would
15   be consistent with when I remember going over to the
16   Attorney General's office, but 2 p.m. Jim Perkins is
17   not the last word on that.
18       Q.  Could you take Exhibit 76 for me and just,
19   your handwriting is like mine.  If you could just read
20   the words for me for the first entry?
21       A.  Yes.  It says, "Eastern Pequot one year and
22   waiting."
23       Q.  Do you recall what the meaning -- let me
24   withdraw the question.
25           Do you understand what the significance
```

Case 2:85-cv-01078-PCD    Document 269-11    Filed 08/16/2005    Page 6 of 18

23

```
 1   of those words were when you wrote it down, what did
 2   it mean?
 3        A.   The reason that I'm tracing this document to
 4   that meeting is really solely because of that entry,
 5   because, as I recall, the question was put to the
 6   Attorney General and his staff, when might we expect a
 7   decision on the petition -- I think it was a petition,
 8   for reconsideration, or words to that effect.  I don't
 9   know what they call it in the federal system or the
10   BIA, but something like that; when might we expect.
11   The answer that was given was, well the Eastern
12   Pequots filed a similar thing and it's been more than
13   a year and no decision has yet been made.  So that's
14   what that --
15        Q.   These notes that have been marked as 76,
16   were those notes you made at the meeting at the
17   Attorney General's office or for yourself going into
18   the meeting?
19        A.   No, at the meeting.
20        Q.   Do you remember who was present at the
21   meeting?
22        A.   I do, or I remember some of the people that
23   were present.
24        Q.   All right.  Who?
25        A.   The Attorney General.  I believe Attorney
```

```
 1   Quinn Cobb; Representative Carson; Dolores Schiesel,
 2   the First Selectwoman of Kent; Jim Perkins; and Fran
 3   Collins, Attorney Fran Collins from Danbury.
 4        Q.   What was the purpose of that meeting?
 5        A.   I believe -- well, as I recall, I was -- Jim
 6   Perkins asked me to arrange a meeting with the
 7   Attorney General, and so I called either Rich Kehoe,
 8   the Attorney General's legislative liaison whom I work
 9   with pretty regularly, or Sue Quinn Cobb and said
10   would you accommodate me by hosting people from one of
11   the communities that I represent who have asked for a
12   meeting.
13        Q.   And did Mr. Perkins tell you what the
14   purpose of the meeting was?
15             MR. SIENKIEWICZ:   Objection to the
16   form.  I think the witness testified he was in the
17   meeting.
18   BY MR. REIF:
19        Q.   Fair enough.  Did Mr. Perkins tell you what
20   his reason was for wanting you to arrange a meeting?
21        A.   Honestly, I don't recall a specific purpose
22   other than Mr. Perkins wished an opportunity to
23   communicate directly with the Attorney General some of
24   the concerns that he had with respect to both the
25   recognition process and the potential consequences of
```

```
 1   recognition.
 2        Q.   How long did the meeting last?
 3        A.   No more than an hour.
 4        Q.   Let's get back to the exhibit, if I might.
 5   Would you take me down to the next entry.  Read that
 6   for me?
 7        A.   It says, "Aboriginal lands."
 8        Q.   What did that mean to you?
 9        A.   I don't recall.  I don't recall.  I wrote it
10   down so.  I have always been confused about the
11   distinction between land, health and trust and
12   Aboriginal lands, so I don't know what that means.
13        Q.   Next entry?
14        A.   Says "Velky."
15        Q.   What did that mean to you when you made it?
16        A.   I knew that Richard Velky is the Chief of
17   the tribe, but I have no idea why I wrote down his
18   name.
19        Q.   Next entry?
20        A.   "Las Vegas Night Repeal."
21        Q.   What did that note mean to you when you
22   wrote it?
23        A.   I was involved in the legislation which we
24   repealed the particular statute which had formed the
25   basis, as I understood it, for gambling to be
```

1  permitted in the state in terms of the predicate for
2  the compact between the Mashantucket or what precluded
3  us from prohibiting gambling, as I understood it, was
4  the presence of this particular law in the books. So
5  the Las Vegas Night Repeal was a gesture on the part
6  of the Legislature to try to foreclose the possibility
7  of additional casinos in the state.
8      Q.  What does the next entry say?
9      A.  "Negotiating of compact."
10     Q.  What did that mean to you when you wrote it?
11     A.  Well, it's also a very murky area of the
12 law, to me, just exactly how a compact negotiation
13 works in terms of the role of the executive branch --
14 well, the executive branch of state government, the
15 legislative branch of state government, and then the
16 kind of supervening federal power to compel
17 acquiescence in certain conditions over the objections
18 of the state.
19     Q.  And that's a concept that you were thinking
20 of when you made that note?
21     A.  Yes, because I still -- I never have
22 completely been able to understand the -- we've passed
23 laws -- we tried to pass laws saying, well, if there
24 is going to be a compact, we want to make sure that
25 the Town of Kent has a seat at the table in the

1  negotiations or that they know the executive branch
2  has to be approved by this committee, probably the
3  government administration elections committee or the
4  body as a whole.
5          So it's just a note -- I don't often make
6  notes. So if I'm sitting in a meeting, if I'm not
7  doodling, I might just highlight some of the high
8  points what's on my mind as we sit through a meeting.
9      Q.    How about the next note?
10     A.    "Recruit towns to be parties to appeal."
11     Q.    What did that note mean to you at the time?
12     A.    I think we were looking -- Kent was looking
13 to some of its sister communities in Northwest
14 Connecticut to -- I don't know if it's amici status
15 that they got, something. The Attorney General sent
16 out a form and said if you want to get on the
17 bandwagon, fill out this form because there are
18 potential land claims in Cornwall and Sherman and New
19 Milford and a number of other communities in Northwest
20 Connecticut, and the goal was to make it as easy as
21 possible for those communities to show their
22 solidarity with the people in Kent.
23     Q.    What does the next note say, and what did it
24 mean to you when you wrote it?
25     A.    "Legislative package." And what that meant

1  was, at that time in October of 2004, I have
2  consistently -- I have communicated with the Attorney
3  General and his office for several years on the
4  recognition process, and I've consistently told them
5  that if there are legislative initiatives which would
6  help the State of Connecticut in making its case, that
7  I stood ready to advocate to the best of my ability to
8  enact those legislative changes.  So as we sat in
9  October 2004 talking about the recognition process, I
10 would have said, let me know, Mr. Attorney General, if
11 there is a change in legislation which would have the
12 effect of protecting North West Connecticut from the
13 prospect of casino gambling.  You let me know what
14 that is and I will do everything I can to get it
15 passed.
16      Q.   Underneath that there's some scribbles.  Are
17 those just doodles?
18      A.   Those are definitely doodles.
19      Q.   Okay.  You pointed to the two items that are
20 on the right-hand side of that page?
21      A.   Yes.
22      Q.   On the left-hand side, there's something; is
23 that a doodle or did that have some meaning?
24      A.   I think it goes back to Aboriginal, but I
25 quit halfway through the word.  It looks like

```
 1             At that meeting was there any specific
 2   discussion as to what Nancy Johnson's office would be
 3   asked to do?
 4        A.   There was discussion, I think at that
 5   meeting there was discussion of the importance of
 6   having hearings to shine a light on some of the
 7   perceived shortcomings of the mechanics of the
 8   recognition process, and that Congresswoman Johnson
 9   and Representative Chase was -- I think Representative
10   Chase was the chair of the Oversight Committee, so
11   there was some discussion about the desirability of
12   Congress examining the particulars.
13        Q.   Other than hearings, was there anything else
14   that was discussed about what Congressman Johnson's
15   office would do?
16        A.   No.
17        Q.   There was not or you don't recall?
18        A.   Actually, I think Congresswoman Johnson had
19   -- as I recall, it was at Congresswoman Johnson's
20   suggestion that -- Jim Perkins and maybe Ken Cooper
21   had maybe met with Nancy Johnson, and Nancy had
22   suggested that their group's interest might be well
23   served were they to obtain a lobbyist in Washington.
24        Q.   Do you know if she made a specific
25   suggestion as to what firm should be retained?
```

# EXHIBIT N

# NORTHWESTERN CONNECTICUT
# COUNCIL OF GOVERNMENTS

## FACSIMILE TRANSMITTAL SHEET

**TO:** 1st Selectmen

**FROM:** Dan McGuinness

**DATE:** 1/10/05

**RE:** Tribal Recognition

**NUMBER OF PAGES:** 1

**NOTES/COMMENTS**

As First Selectman Schiesel mentioned at the January COG meeting, the Town of Kent and a TASK, a non-profit organization, are working together on tribal recognition issues.

TASK is sponsoring a meeting with their Washington DC representatives, Barbour, Griffith & Rogers, on Friday, January 21st, at 6:30 pm at the Fife & Drum Restaurant, North Main Street, Kent. At this meeting, the Barbour, Griffith and Rogers representatives will provide their perspective on tribal recognition.

TASK is inviting 1st Selectmen in the Northwest Corner to attend this meeting.

Please contact Jim Perkins of TASK at 860-927-3692 or jnper@earthlink.net if you plan to attend. You can also contact Mr. Perkins if you have any questions regarding the meeting.

cc: file

**17 SACKETT HILL ROAD
WARREN, CT. 06754
PHONE: 860-868-7341  FAX: 860-868-1195
E-MAIL: nwccog1@snet.net**



PLAINTIFF'S DEPOSITION EXHIBIT
STN-19
7/20/05 SAR

# EXHIBIT O



# TOWN OF KENT, CONNECTICUT 06757

41 Kent Green Boulevard
P.O. Box 678
Kent, CT 06757-0678
(860) 927-4627
FAX (860) 927-1313
~~selectmans.office@snet.net~~

firstselectman@kentct.org

June 22, 2004

Town Action to Save Kent
c/o Mr. Kenneth Cooper
P.O. Box 72
South Kent, Connecticut 06785

Dear Ken:

    Please accept my resignation from the Board of Directors of Town Action to Save Kent, Inc. I also apologize for not responding sooner.

    I appreciate that your organization has admirable goals. While I understand you were seeking close lines of communication between TASK and the town, I think they are best served with private citizens on the board. I have full faith that we will keep in close contact on this important topic. As always, good luck.

                                     Very truly yours,

                                     Dolores R. Schiesel
                                     First Selectman

DRS/drs
cc: Rebecca Richards to rrichard@debevoise.com



PLAINTIFF'S DEPOSITION EXHIBIT
STN-6
7/20/05  SAR

# EXHIBIT P



## TOWN OF KENT, CONNECTICUT 06757

41 Kent Green Boulevard
P.O. Box 678
Kent, CT 06757-+0678
(860) 927-4627
FAX (860) 927-1313
selectmans.office@snet.net

6/22/04

Dear Jim and Ken,

You have spoken with me about contacting municipal leaders throughout the country regarding the impacts of tribal nations and casino tribes on their communities. Ken outlined a plan whereby a TASK person would compile a contact list which I could use. I would then report back for further contact by TASK.

I just wanted to confirm I am more than willing to make these calls. It is helpful for all of us and only serves the greater good. Please let me know if you want my help.

Yours,
Larry Schierel



PLAINTIFF'S DEPOSITION EXHIBIT
STN-7
7/20/05 SAR