# EXHIBIT S

# Westlaw.

Not Reported in F.Supp.2d                                                                                         Page 1

Not Reported in F.Supp.2d, 2002 WL 32114492
**(Cite as: Not Reported in F.Supp.2d)**

C
Not Reported in F.Supp.2d, 2002 WL 32114492
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Carleen AHERN
v.
TRANS UNION LLC ZALE CORPORATION
No. 301CV02313 (DJS).

Filed Dec. 11, 2001.
Oct. 23, 2002.

Joanne S. Faulkner, Law Offices of Joanne Faulkner, New Haven, CT, for Carleen Ahern, plaintiff.
Ira W. Bloom, Wake, See, Dimes & Bryniczka, Westport, CT, Bruce Luckman, Satzberg, Trichon, Kogan & Wertheimer, Philadelphia, PA, for Transunion LLC, defendant.
Miles David Newman Esty, Tara M. Barbara, Esty & Buckmir, New Haven, CT, for Zale Corp, defendant.

SQUATRITO, J.
*1 Defendant has not met its burden of showing that the Magistrate Judge's order was clearly erroneous or contrary to law. See 28 U.S.C. § 636(b)(1)(A). The specific aspects of the order to which defendant objects are well within the discretion afforded the Magistrate Judge.

Motion to set aside Magistrate's Discovery Ruling Denied.

*RULING ON CROSS-MOTIONS TO COMPEL AND MOTION FOR PROTECTIVE ORDER*

SMITH, Magistrate J.
The plaintiff, Carleen Ahern, has brought this action against the defendant, Transunion, LLC (hereafter "Transunion"), alleging that Transunion violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et. seq.;* the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42-110a *et. seq.;* the Consumer Credit Reports Act ("CCRA"), Conn. Gen.Stat. § 36a-695; and common law. The parties' cross-motions to compel are pending before the court. In addition, Transunion has moved the court to enter a protective order in this matter. For the reasons set forth below, the plaintiff's motion to compel (Dkt.# 33) is GRANTED in part and DENIED in part and Transunion's motion to compel (Dkt.# 28) and motion for protective order (Dkt.# 37) are DENIED.

*I. THE SCOPE OF PERMISSIBLE DISCOVERY*

Rule 26(b)(1) of the Federal Rules of Civil Procedure states, in pertinent part, that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the claim or defense of any party...." Fed.R.Civ.P. 26(b)(1). Information that is reasonably calculated to lead to the discovery of admissible evidence is considered relevant for the purposes of discovery. *See Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991); *Morse/Diesel, Inc. v. Fidelity & Deposit Co.,* 122 F.R.D. 447, 449 (S.D.N.Y.1988). A party may not object to a discovery request on the grounds that the information sought will be inadmissible at trial so long as the material requested could lead to other information that may be relevant to the subject matter of the action. *See id.*

A party may object to a request if it is "overly broad" or "unduly burdensome." 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2174, at 297 (2d ed.1994). To assert a proper objection on this basis, however, one must do more than "simply intone [the] familiar litany that the interrogatories are burdensome, oppressive or overly broad." *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.,* 105

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 2

Not Reported in F.Supp.2d, 2002 WL 32114492
**(Cite as: Not Reported in F.Supp.2d)**

F.R.D. 16, 42 (S.D.N.Y.1984). Instead, the objecting party must "show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Id.* (internal citations and quotation marks omitted).

*2 The objecting party may not leave it to the court to "sift each interrogatory to determine the usefulness of the answer sought." *Id.* To the contrary, the claims in the complaint defines the liberal guidelines for determining the relevance of the discovery requests, and the burden is on the party resisting discovery to clarify and explain its objections and to provide support for those objections. *Id.*

### II. PLAINTIFF'S MOTION TO COMPEL FN1

> FN1. Plaintiff has not identified Interrogatory Nos. 11 & 13 in her Memorandum of Law in Support of her Motion to Compel pursuant to D. Conn. L. Civ. R. 9(d)(3). Accordingly, the Court denies plaintiff's motion as to these interrogatories.

#### A. Discovery Requests Not Objected to: Interrogatory No. 10

Plaintiff asserts that Transunion has failed to respond to Interrogatory No. 10. Transunion did not object to this interrogatory. In addition, Transunion has not sought an extension of time to produce its response. No objection having been made, *see Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468, 1473 (9th Cir.1992) ; *Smith v. United States,* 193 F.2d 201, 207 n. 19 (D.Del.2000) (failure to object results in waiver of objection), and no argument having been offered in opposition to plaintiff's motion, see Rule 9(a) 1 Local Rules of Civil Procedure ("[f]ailure to submit a memorandum in opposition to a motion may be deemed sufficient cause to grant the motion ...."), the motion to compel is granted as to this item.

#### B. Disputed Requests For Production

*1. Requests for Production Nos. 14, 15, & 22*

Although Transunion objected to these requests in its initial response, the production requests are not opposed in Transunion's opposition papers. Absent objection, the court orders Transunion to comply with these production request.

*2. Requests for Production Nos. 6 & 12*

In Request for Production No. 6 the plaintiff seeks copies of all judgments, court opinions, complaints, and consent orders concerning Transunion's practices under the FCRA in or after the year 1997. Contrary to Transunion's objection, this request is not overbroad, vague, ambiguous or unduly burdensome; nor is the requested information not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's request is reasonably limited as to scope and time. The material sought is clearly relevant to the state of mind with which Transunion acted. It is also relevant to whether Transunion alleged statutory violations occurred after it had actual notice that its practices were actionable. While it may be burdensome to require Transunion to compile and permit discovery of the various legal complaints and judgments against it from 1997 to the present, surely these documents are not so voluminous that it is an unreasonable or unfair burden for defendant to shoulder.

In Request No. 12, the plaintiff requests formal and informal complaints, demands, or settlements concerning Transunion's furnishing or reporting information about an individual on someone else' credit file, involving identity theft. While the court concludes that it is permissible to permit discovery into formal complaints filed against Transunion regarding identity theft, it would be improper for the court to allow the production of informal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 3

Not Reported in F.Supp.2d, 2002 WL 32114492
**(Cite as: Not Reported in F.Supp.2d)**

documents containing sensitive information of third parties. Accordingly, Transunion is ordered to produce all judgments, court opinion and orders, complaints, consent orders, and non-confidential settlement agreements involving itself and identity theft matters that are of *public record.*

### 3. Request for Production No. 16

*3 Plaintiff also seeks financial material from Transunion including, all documents in and since January 2001 showing Transunion's net worth. Transunion has agreed to provide this information under seal with the Court to be held pending the disposition of a motion for summary judgment and/or directed verdict. Transunion's objection as to this request is not unreasonable and, therefore, is sustained. The court orders that Transunion shall produce this material under seal to be held pending a motion for summary judgment and/or directed verdict. Transunion shall provide this information to the plaintiff within one week after the court rules on any and all dispositive motions. Thereafter, the plaintiff is free to use such information at trial.

### 4. Requests for Production Nos. 11, 17, 18, & 19

Transunion contends that the court should strike these requests because the plaintiff has failed to make such a claim in this action. Transunion states that it should not be required to produce these documents because the plaintiff's information was properly sent to one of the entities in question. The plaintiff contends that these requests relate to Transunion's furnishing information to entities which had no permissible purpose. In addition, the plaintiff states that questions remain as to other entities which allegedly had no permissible purpose. The court orders that Transunion produce these documents. Moreover, Transunion has completely failed to substantiate its original objection to producing these documents and is not free to raise in its brief-almost as an afterthought-entirely new objections which it did not assert earlier. *Davis v. Fender,* 650 F.2d 1154, 1160 (9th Cir.1981) ; *Eureka Financial Corp. v. Hartford Act. and Index. Co.,* 136 F.R.D. 179 (E.D.Cal.1991).

### III. TRANSUNION'S MOTION FOR PROTECTIVE ORDER

The plaintiff seeks a response to Interrogatories Nos. 14, 15, 16, & 18 as well as the production of documents corresponding to Request for Production No. 3. Transunion contends that its resistance to answering these interrogatories and producing the requested documents is based upon issues of confidentiality and "serious and substantial business concerns to avoid unfair competitive advantage in the industry." Accordingly, Transunion moves the court to enter a protective as to the discovery material in question.

A court need not grant a protective order unless it is satisfied that the order is being sought for an actual trade secret or confidential business information and that there is good cause for the protective order. Rule 26(c) of the Federal Rules of Civil Procedure, which authorizes the issuance of protective orders, provides that such an order may be issued in connection with discovery necessary "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." Fed.R.Civ.P. 26(c). As a prerequisite to the issuance of such a protective order, Rule 26(c) requires a showing of "good cause." Once good cause has been demonstrated, the burden then shifts to the party resisting the issuance of the order to show why the court should allow free dissemination of the disputed discovery materials. *Culinary Foods, Inc. v. Raychem Corp.,* 151 F.R.D. 297, 300-01 (N.D. Ill.1993) (citation omitted).

*4 In addition, blanket protective orders, without a showing of specific harm from disclosure, are rarely justified. *See e.g., Beckman Industries, Inc. v. International Ins. Co.,* 966 F.2d 470, 476 (9th Cir.1992) ("Broad allegations of harm, unsubstantiated by specific examples of articulated reasoning, do not satisfy the Rule 26(c) test.") In addition, bald assertions of confidentiality, such as a statement by a movant that disclosure could harm the movant's competitive position, are insufficient for a court to enter a protective order.

In the present case, Transunion has not substantiated its assertion that the material it seeks

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 4

Not Reported in F.Supp.2d, 2002 WL 32114492
**(Cite as: Not Reported in F.Supp.2d)**

to protect is either confidential or a trade secret. Nor has Transunion cited specific examples, or articulated reasoning, indicating it will suffer harm if the court does not enter a protective order in this case. Even assuming that the material contains confidential information, Transunion not demonstrated that it has met the good cause standard required by Rule 26(c).

It is apparent that Transunion failed to seek a protective order when the plaintiff originally sought the discovery material at issue. Transunion now attempts to circumvent the plaintiff's motion to compel and its discovery obligations as mandated by the Federal and Local Rules of Civil Procedure by seeking a protective order. The court finds that the requested information is relevant in this case. That Transunion considers documents proprietary and confidential falls short of establishing grounds for a protective order or any recognized immunity from discovery. More than a mere assertion is required to perfect an exemption or immunity from discovery. *See e.g., Baxter International, Inc. v. Abbott Laboratories,* 297 F.3d 544, 547 (7th Cir2002). Accordingly, the Transunion's motion for a protective order (Dkt.# 37) is DENIED and plaintiff's motion to compel as to Interrogatories Nos. 14, 15, 16, & 18 as well as the production of documents corresponding to Request for Production No. 3 is GRANTED.

*IV. TRANSUNION'S MOTION TO COMPEL*

Transunion has not provided the court with a " specific verbatim listing of each of the items of discovery sought" as required by D. Conn. L. Civ. R. 9(d)(3). In addition, Transunion's memorandum also fails to follow each specification with the reasons why the item should be allowed. D. Conn. L. Civ. R. 9(d)(3). While it appears that Transunion offers some reasons for the requested material, the memorandum as a whole fails to comply with Rule 9 . Accordingly, Transunion's motion to compel (Dkt.# 28) is DENIED.

*V. CONCLUSION*

For the aforementioned reasons, the plaintiff's motion to compel (Dkt.# 33) is GRANTED in part and DENIED in part and Transunion's motion to compel (Dkt.# 28) and motion for protective order (Dkt.# 37) are DENIED. The defendant is ORDERED to produce the aforesaid information and material to plaintiff within twenty (20) days hereof. At the conclusion of this case, or upon application, the plaintiff is free to seek an award of attorney's fees in connection with successful prosecution of her motion to compel. *See* Fed.R.Civ.P. 37.

*5 This is not a recommended ruling. This is a discovery ruling and order which can be reviewed pursuant to the "clearly erroneous" standard of review. 28 U.S.C. § 636(b)(1)(A) ; Fed. R. Civ.P. 6(a) and 72(a); and Rule 2 of the Local Rules for U.S. Magistrate Judges. As such, it is an order of the court unless reversed or modified by the district judge upon motion timely made.

IT IS SO ORDERED.

D.Conn.,2002.
Ahern v. Trans Union LLC Zale Corp.
Not Reported in F.Supp.2d, 2002 WL 32114492

Briefs and Other Related Documents (Back to top)

• 3:01CV02313 (Docket) (Dec. 11, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT T

SBC Yahoo! Mail - dschiesel@snet.net                                      Page 1 of 1

# YAHOO! MAIL

Print - Close Window

**Date:** Tue, 24 Aug 2004 06:25:17 -0700 (PDT)
**From:** "Dan Schiesel" <dschiesel@snet.net>
**Subject:** Re: Fw: Gov Rell Meerting
**To:** "Jim Perkins" <jnper@earthlink.net>

Thanks Jim, this looks fine. I spoke with Andrew and he seemed on board. I am having some trouble with office e-mail address, but hope to be corrected shortly. Lorry

**Jim Perkins <jnper@earthlink.net> wrote:**

> Sent following to your office e-mail address. Internet couldn't deliver. Ken okay with proposed e-mail to Roraback. You?
>
> Jim Perkins
> 06785
> ----- Original Message -----
> **From:** Jim Perkins
> **To:** Lorry Schiesel ; Ken Cooper
> **Sent:** Monday, August 16, 2004 10:03 AM
> **Subject:** Gov Rell Meerting
>
> See draft attached for Andrew to follow through on. He'll want to comment on it as well, but let's start first with yours.
>
> Jim Perkins
> 06785

*No attachment* > ATTACHMENT part 2 application/msword name=Gov Meeting Purpose.doc



http://us.f803.mail.yahoo.com/ym/ShowLetter?box=Sent&MsgId=3917_0_37905_638_961_...    7/13/05

SBC Yahoo! Mail - dschiesel@snet.net
Case 2:85-cv-01078-PCD    Document 269-13    Filed 08/16/2005    Page 8 of 15

Page 1 of 1

# YAHOO! MAIL

Print - Close Window

**Date:** Tue, 2 Nov 2004 07:30:45 -0800 (PST)
**From:** "Dan Schiesel" <dschiesel@snet.net>
**Subject:** Re: FW: The Kent Tribune | Kent Town Meeting Friday Night will Take up A Number of Issues, including Continued Funding of the Appeal of Schaghticoke Federal Recognition
**To:** kcooper@rcn.com

Ken: I expect it will go well, but I would urge supporters of the town's efforts to come and make it clear. This is a good opporunity in a quiet forum. Lorry

**Ken Cooper <kcooper@rcn.com> wrote:**

> What is going to happen? Do we need to be there to support this? Will there be any objections?
>
> -----Original Message-----
> From: jim@blackketter.com [mailto:jim@blackketter.com]
> Sent: Monday, November 01, 2004 9:40 PM
> To: kcooper@rcn.com
> Subject: The Kent Tribune | Kent Town Meeting Friday Night will Take up A Number of Issues, including Continued Funding of the Appeal of Schaghticoke Federal Recognition
>
> Here's some updated information from KentTribune.com
>
> ---
>
> Kent Town Meeting Friday Night will Take up A Number of Issues, including Continued Funding of the Appeal of Schaghticoke Federal Recognition
> Web Posted Monday, November 01, 2004
> HTTP://www.kenttribune.com/main.asp?SectionID=19&SubSectionID=47&ArticleID=6565



> ⚠ Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Dolores Schiesel**

**From:** Jim Perkins [jnper@earthlink.net]
**To:** Dolores Schiesel
**Cc:**
**Subject:** TASK talking poins
**Attachments:** Jim Perkins.vcf(195B); TalkingPoints.doc(58KB)

**Sent:** Mon 11/22/2004 8:53 AM

After reading, I'm not sure what's usable for the HVCEO document But you should see in any event what we're saying to groups who have little knowledge of the circumstances.

Jim Perkins
06785


PLAINTIFF'S DEPOSITION EXHIBIT

TASK
Presentation Talking Points

The Department of Interior, Bureau of Indian Affairs (BIA) has an absolute right to grant an Indian Tribe Federal recognition. This means national sovereignty and with it the privilege of conducting gambling activities, acquiring land, establishing enterprises free of local and state regulations and taxes.

Most people are under the mistaken notion that the issue is a possible casino on the 400 acre reservation in Kent. This is not really the issue. It is the impact of a sovereign nation within the borders of the town together with the cash flow from a casino, regardless of its location, that creates a problem for Kent. Experience in similar small communities across the country give us some indication of what to expect:

The tribe quickly deploys its excess cash flow to become the largest landowner in the town. A casino in Western CT will generate in excess of $1 billion per year. Because of their special privileges no one can compete with their acquisition proposals. In Ledyard and North Stonington the Mashantucket's own over 50% of the commercial real estate.

After purchasing land they claim immunity from property taxes even if it has not been formally incorporated into the reservation. This creates an enormous legal expense on the part of the town to defend its tax base.

Although the largest landholder, the group does not participate in the community planning as this is inconsistent with their status as a sovereign nation only required to deal with the Federal government.

The point is the existence of a large and ever growing land mass within the town over which the community has no control, but is required by law to provide public services. Most of these communities become modern day versions of "company controlled towns."

The BIA process has been corrupted by money and politics, as tribes, backed by individual business men and corporations, many of them off-shore, have petitioned for recognition. The BIA lacks fundamental procedures found in other Federal agencies. It has no

revolving door policy and is without sufficient oversight. Its mission is to support tribes' efforts to gain recognition. It has demonstrated it is easily influenced in favor of Indian recognition. The Inspector General for the Department of Interior in his review of the recognition process said, "The regulations, as written, are permissive and inherently flexible, and therefore afford latitude in the evidence used and considered to support Federal acknowledgment."

Generally, petitioning tribes are legitimate and deserving, most so in western states where tribes have demonstrated social, political and cultural continuity. In Connecticut, however, where tribal cohesiveness disappeared in the 18th and 19th century, with the exception of the Mohegans, no such legitimacy exists, and made-up groups are backed by non-Indians to gain financial rewards unattainable otherwise. One such group – the one now confronting Kent – is a family from Derby, Connecticut (48 miles from Kent), largely of Czechoslovakian origin – that has declared itself descendents of the Schaghticoke Tribe – appointed its eldest member, Richard Velky, Chief of the Schaghticoke Tribal Nation (STN). It has the financial support of Fred Deluca, founder and co-owner of the Subway sandwich shop chain, who has admittedly spent $12 million on the effort. It is also backed by the Eastlander Group, a Middletown venture capital firm, and another newly formed group, the Native American Gaming Fund, a New London corporation recently assembled by former state Rep. Dean P. Markham and former New York Yankee John C. Ellis.

The group's letter of intent to file a petition was made in 1981, but it took 13 years to file its application in 1994. Strangely, <u>STN's application was first denied in December 2002</u> for failing to meet the established criteria for recognition. Among other things, there were gaps of over 80 years in political and social continuity. Then 14 months later, <u>in January 2004, the BIA reversed their decision</u> – even though it still did not meet the criteria. Among papers filed by STN, Kent's attorney discovered an internal BIA memorandum that amounted to a confession that, indeed, STN did not meet the criteria, but in so many words said, let's recognize them anyway.

Connecticut's Attorney General as well as the Town of Kent have filed appeals. Unfortunately, the appeals – by regulation – are filed with the IBIA, the bureau's own board of appeals. The likelihood that the

appeals might be granted is small. The Interior Department's own inspector general in a recent audit of the STN decision said that the interpretation of the recognition rules were so inherently flexible, that almost any decision could be justified. We expect that a decision on the appeal will be issued within the next 12-18 months. Which ever side loses will surely take the matter to the CT Federal District Court.

<u>Which is why several of your neighbors in South Kent founded TASK</u>. While the town and AG were appropriately pursing their legal and procedural alternatives, a citizen's group could use the time created to pursue parallel political options available through the Congress and through the State legislature. Before we tell you what they are, let us dwell for a moment on what final recognition of STN can mean to the Town of Kent and the Northwest corner of Connecticut.

First, there are land claims to be resolved. STN has already claimed over 2000 additional acres in Kent as theirs -- much of it sitting under the Kent School – with the suggestion that STN might also claim another 8000 acres in the town. The claims are pursued under legislation put in place in 1790 with no statute of limitation.

Secondly, while STN might set up a casino elsewhere in the state – as widely reported and the BIA permitting –it could immediately establish other forms of gambling on the reservation, located just across the Housatonic from downtown Kent – card rooms, bingo parlors, and video slots; and set up retail outlets for tax free liquor, tax free gas and tax free cigarettes; and because it is not bound by any zoning or land use regulations, it could use its land – and any abutting land it might acquire – in ways that would be environmentally detrimental to the region.

Such activity would create, first, an immense and crippling increase in traffic, both on the numbered arteries and on the side roads, as well; secondly, a financial burden on the community, having to deal with increases in crime; and thirdly, eventual loss of the town's ability to govern itself as the cash flow from gambling operations is invested in local real estate, local business and other forms of economic development conducted tax free. Kent, as we know it today, would disappear, land use would change and the influx of the gambling public and the low wage employees attracted to the area would stifle the legitimate economic and

social activities of the entire Northwest corner. We could see tourist buses on the roads of South Kent.

<u>As we indicated,</u> the State and the community are essentially restricted to seeking <u>legal</u> relief. TASK, working closely with our elected officials, both in the State and in Washington, has been organized to seek <u>legislative</u> relief, its campaign already begun.

First, in Washington, to create real reform of the poor practices rampant within the BIA; to promote the codification of the BIA's recognition criteria as law, so they cannot be easily subverted within the Bureau; to lobby Congressional committees – Resources, Indian Affairs, Appropriations – where Connecticut has no representation in the house and only one voice in the Senate; and to support our Congressional delegation's efforts to 1. shine some sun on the recognition process by opening to the public the BIA's review practices, 2. promote the amendment of the Indian Gaming Regulation Act (IGRA) that places onerous mandates on the State to accept all gambling entitlements granted a tribe by the BIA, and 3. initiate federal legislation that provides relief to a state and its communities affected by recognition.

Until TASK became active, our community had no active program working in Washington, despite its total control over the recognition process. Because so many of the decisions are not decided on their merits, rather in backroom deals, active, aggressive feet on the ground in Washington is critical to protecting our community. We are very close to selecting professional advisors to improve the effectiveness of our Washington efforts.

At the State level, TASK is widening Kent's political base by attracting neighboring communities in the region in support of its position. TASK has already gained the cooperation of the Housatonic Council of Elected Officials. Meeting have been held with the Governor, her staff in Hartford and in Washington -- and with our State senators and representatives. The State's stake is significant since 13 new tribes are applying for recognition and claiming land which totals 1/3 of the State's land mass.

TASK's objectives are two-fold: 1. for the State to put pressure on the Congressional delegation in Washington to pursue every available

remedy available to it. (This week, the Governor has an appointment call with Gale Norton, Secretary of the Interior. TASK placed two items on the Governor's talking agenda.) and 2. to draft and promote the passage of State legislation that would provide remedies to Connecticut communities affected by tribal recognition; and 3. to inform the public of the illegitimacy of STN's effort. TASK's efforts are not anti-Indian.

In addition to a misunderstanding of the gambling vs sovereign nation issue, there are many other misunderstandings in the community. Everyone's initial reaction is to look for the "silver bullet" to fix our problem. All of the knowledgeable people know that there is no silver bullet, only a disciplined, long series of bureaucratic initiatives, the cumulative effect being to create a positive opportunity for Kent. This sounds so outrageous that many are in total denial of the possibility of negative consequences for Kent. This is in spite of the fact that the scenario has happened in 100's of similar towns throughout the US. Another misunderstanding is the futility of fighting our National guilt complex with the abuses suffered by Indians. Fighting anything Indian is somehow thought of as ignoble. Little of the wealth being created by made up casino tribes reaches the movement's poor. It does enrich tribal financial backers. Once recognized there are no restrictions, other than bylaws, on tribal membership. Leadership doubles and triples the size of the tribe dispensing profit shares in order to project their power. The Indian press is quite open on this and internally very critical, but like most interest groups set aside internal problems when dealing with external pr.

At this point many of you may be thinking that this is a hopeless cause. We agree that the odds are long, however the effort is not hopeless. In the past six months alone, none other that John McCain (R-Arizona) in the Senate and Richard Pombo (R-California) in the House (both significant supporters of the tribes across the country…and recipients of their financial contributions) have recognized that abuses in political process and the influence of casino money jeopardize the gains made by the entire Indian movement. The time may just be right to get support for reform in the interests of all parties, most importantly the Indians, who do not want to lose the sympathy of John Q Public. Sunshine is our friend, and the House seems to be warming up to that and aggressively pursuing actions to promote it. Our new governor is much

more proactive on this issue and is inclined to actively advance thoughtful initiatives, rather that wait until it is too late to take action.

<u>All this takes money.</u> To be spent on representation in Washington and in Hartford, in communications and, to a lesser extent, on operating expenses. Our conservative budget over the next three years is $1.5 million. TASK has an experienced team to manage the budget and to participate itself in the process. This week TASK will appoint a (politically based) firm in Washington to work for TASK on representing Kent's interests. It has appointed a firm in Connecticut to work closely with TASK's principals as well. TASK people are volunteers.

I think we should stop at this point and answer any questions that you may have.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■